## NORTH POWDER MILLING CO. *v.* COUGHANOUR.

[54 Pac. 223.]

PRESUMPTION AS TO INTEREST DEEDED.—The grantor in a deed of part of the land owned by him will be presumed to have intended to convey and the grantee to have intended to take the premises as they openly and visibly appeared at the time the sale was consummated, where the intention of the parties is not discoverable from an inspection of the deed, and proof of actual knowledge of the contracting parties with reference to the physical condition of the premises cannot be obtained; but where the actual intent of the parties is shown it will control.

CONSTRUCTION OF GRANT OF WATER RIGHT.—The owner of a mill and an appurtenant water right was unable to get wheat to grind, and hence appropriated a portion of the water of a tributary creek eleven miles above the mill

to irrigate land to be cultivated in wheat. Afterwards he conveyed the land, irrigation ditch, and appurtenant water right, without reservation, representing that part of the land needed water only in dry seasons, and that the water could be sold to good advantage; that he owned the water right on account of the mill; that the ditch could be enlarged to any size; and that the land would make one of the best wheat farms in the valley. *Held,* that the grantee's right was limited to the use of water to irrigate land for the growth of wheat.

WATER RIGHT—PRIORITY.*—One to whom the owner of a mill sends a letter, stating that if he buys certain land from the writer the latter will give him, on paying a specified amount, half of a ditch diverting water from the mill race, cannot claim any interest in the water of such ditch as against one to whom the mill is sold before the deed to the ditch is executed.

WATERS—RIGHT OF RIPARIAN PROPRIETOR.—The first settler on a stream may either divert the water or exercise his common law right to have it flow in its accustomed channel, but he cannot do both; the two rights are incompatible.

ADVERSE USER—LIMITATION OF ACTION.—A right by adverse user cannot be acquired to water in a stream or ditch so long as there is enough for both or all claimants; and until some one's use is curtailed there cannot be a cause of action against which to invoke the statute of limitations.

PLEA IN ABATEMENT.—Where one who is sued for diverting water from a prior appropriator defends on the ground that the water was diverted by others after it passed him, it is in the nature of a plea in abatement, and is demurrable if the defect of parties defendant does not appear on the complaint, and defendant does not name the omitted parties.

From Union :    ROBERT EAKIN, Judge.

Suit to enjoin the diversion of the waters of a natural stream.    Plaintiff had a decree and defendants appeal.

AFFIRMED.

For appellants there was a brief over the name of *J. H. Slater* and *Sons,* with an oral argument by *Mr. Robert J. Slater.*

For respondent there was a brief over the name of *Thos. H. Crawford,* with an oral argument by *Mr. Geo. G. Bingham.*

---

*NOTE.—See 60 Am. St. Rep. 799 for a valuable note considering What Constitutes an Appropriation of Water; and also 30 L. R. A. 665, where there is an extensive note on the Right of Prior Appropriation of Water.—REPORTER.

Mr. Chief Justice Moore delivered the opinion.

This is a suit by the North Powder Milling Company, a corporation, against W. A. Coughanour and S. M. Duff, his agent, to enjoin them from diverting the waters of a natural stream, and to recover damages alleged to have been sustained by reason of such diversion.   The material facts are that in 1870, one N. Tartar commenced the construction of and two years thereafter completed a flour mill on the left bank of the North Powder River at the town of North Powder, Union County, Oregon, and diverted water from the river at a point about one mile west of the mill site, which he conducted in a race-way, and made a prior appropriation thereof by applying it to a "home-made" wooden turbine wheel, about thirty-six or forty inches in diameter, which propelled the machinery in said mill, consisting of one set of four foot burrs, one set of eighteen-inch chopping burrs, elevators, cleaners, suction fan, smut mill and bolting machine.   April 25, 1878, Tartar conveyed an undivided one-half interest in said mill and water right to one James G. Welch, who, on August 27, 1881, obtained the remaining interest therein, and in 1883, having enlarged the mill race and erected another building, occasionally applied the water, when not used at the flour mill, to a similar wheel which propelled a planer and other wood-working machinery in the new building.   October 4, 1880, Welch, Joseph H. Shinn and D. W. Lichtenthaler posted, at a point on the left bank of Anthony Creek, about eleven miles west of the mill site, and filed in the office of the county clerk of said county, a notice subscribed by them to the effect that they claimed and intended to appropriate two thousand inches of the water of said creek, to be diverted at said point and conducted in ditches and flumes to the town of North Powder, to be used for agricultural, mining and

mechanical purposes. Shinn having abandoned his interest in said water right, his associates immediately commenced the construction of the ditch, but on December 16, 1882, Lichtenthaler having conveyed to Coughanour all his interest in the water right, the latter and Welch, in March, 1886, completed the ditch and appropriated the water of said creek to the irrigation of their lands, and on March 6, 1887, Welch also conveyed to Coughanour certain lands which had been thus irrigated, together with his interest in the ditch and water right. On July 17, 1886, Welch had conveyed the town site of North Powder, including the flour mill and its appurtenances, to M. M. Marshall, O. N. Ramsey and Thomas F. Hall, from whom, on October 11, 1892, by mesne conveyances, plaintiff obtained the legal title to the latter property.

In 1888 the then owners of said mill removed therefrom the "home-made" wheel, and in lieu thereof supplied a Flanagan turbine, thirty and one-half inches in diameter, and in 1892 plaintiff remodeled the mill, furnishing an improved roller process for manufacturing flour, and more modern machinery in place of the burrs, and other appliances, so that its capacity was increased from about thirty to about sixty barrels of flour per day. Anthony Creek rises in the Blue Mountains, flows in a southeasterly direction, and empties into the North Powder River at a point about seven miles above the mill site. About the first of April the water of North Powder River and its tributaries commences to rise from melting snow in the valley, and this volume in May and June is largely increased by the melting snow on the mountains, but by the first or middle of July the water begins to subside, and in August or September is usually quite low, remaining in that condition until the fall rains commence, about the first of October. Coughanour owns a large tract of arid land, situated west of the mill site, one

thousand three hundred and sixty acres of which are fenced, two hundred and fifty acres in cultivation, and the entire tract, except about thirty acres, is susceptible of irrigation by his ditch with water from said creek, thereby producing excellent crops of grass, hay, grain, fruit, and vegetables, but without the use of such water this land is nearly valueless. In 1879 Coughanour placed upon his ranch about two hundred head of two-year-old heifers, which in 1892 had increased to about four hundred head of stock, to afford late pasture for which he seeded down to clover and alfalfa about sixty acres of the cultivated land, which was irrigated through the summer and fall, but theretofore, he had raised grain thereon which required irrigation only until about the first of July.

In the summer and fall of 1895, and from July 1 to August 24, 1896, when this suit was commenced, the waters of North Powder River and its tributaries were unusually low, so much so that plaintiff was unable to operate its mill to the full capacity, and, claiming that the diminution of its motive power was attributable to defendant's diversion, this suit was instituted for relief. Plaintiff alleged that its grantors and predecessors in interest made a prior appropriation of the water of North Powder River to the extent of one thousand two hundred inches, miners' measurement, under six inches of pressure, which quantity, since the completion of the mill, had been constantly used in its operation; and that defendants unlawfully diverted five hundred inches of water, miners' measurement, from Anthony Creek, above the head of the race-way of its mill, whereby the operation thereof had been retarded at the time and in the manner indicated, to its damage in the sum of $1,000. The issues having been joined, a trial was had, and from the evidence taken thereat the Court found the facts, in substance as herein detailed, and also that plaintiff was

entitled to one thousand inches of water, to be measured at the head of the mill-race, under six inches of pressure, and that it recover the sum of $200 as damages, and thereupon gave a decree in accordance with such findings, and also perpetually enjoined Coughanour and his agent, Duff, their servants, etc., from depriving plaintiff of any part of the water so awarded to it, from which decree defendants appeal.

It is contended by defendants' counsel that Welch, being the sole owner in fee of certain lands and of the flour mill property with its appurtenant right of prior appropriation, could change the point of diversion from the race-way on North Powder River to the bank of Anthony Creek, where the notice was posted, and could also alter the use of the water from the operation of a flour mill to the irrigation of arid land; that their client, at Welch's request, and upon his representation that he owned the water right, and that the ditch in question could be enlarged to any size, purchased from Lichtenthaler certain real property and an undivided one-half interest in the ditch and water right, and thereafter also purchased from Welch certain other real property, to the irrigation of which the waters from said creek had been appropriated, obtaining from the latter a deed therefor, which also conveyed the remaining interest in the ditch and water right without any reservation whatever; and that Welch, in irrigating said land with water diverted from the creek, thereby created an advantage thereto to the detriment of his mill property, and upon conveying such lands to Coughanour without reservation the latter took them as they openly and visibly appeared at the time the deed was executed, thereby obtaining the permanent right to divert the waters of Anthony Creek and appropriate the same to the irrigation of his lands.

The documentary evidence, introduced at the trial,

shows that from August 27, 1881, to July 17, 1886, Welch was the sole owner in fee of the flour mill and its appurtenant water right, during which time the ditch was constructed by himself and Coughanour, the water diverted from Anthony Creek and appropriated to the lands owned in severalty by them, and when the latter succeeded to Welch's interest in the arid lands, ditch and water right, on May 6, 1887, no reservation was made in the conveyance evidencing the transfer of the title. Welch, on November 3, 1882, wrote Coughanour that Lichtenthaler, having become discouraged at the poor progress made in the construction of the ditch, upon which they had worked two years, would, in consideration of the payment of $1,860, relinquish his interest in six hundred and forty acres of public land upon which he had a filing under the Desert Land Act of the United States, so as to permit the purchaser to make a filing thereon, and also convey two hundred and eighty acres of State land and his interest in the ditch and water right; that Lichtenthaler had paid $400 and owed $500 on account of the construction of the ditch, which latter sum would have to be paid by the purchaser in addition to the consideration so demanded. Welch also enclosed a plat of the lands in question, the character and value of which he carefully described, and, in order to induce Coughanour to effect a purchase of said premises and water right, wrote him as follows: "The ditch is to carry six hundred inches. There is a part of this land that don't need water only in dry seasons, but the water can be sold to good advantage. It covers twenty thousand acres, and I own the water right on account of the mill. The ditch can be enlarged to any size. The ditch is considered good property by every one in this county. This will make one of the best wheat farms in this valley. * * * This is

money invested that there is no chances to take.'' Mr. Coughanour, as a witness in his own behalf, says, in substance, that he inferred from Welch's letter that there would never be any trouble in reference to the water, from the fact that the latter owned the first right, and was willing to furnish water for irrigating at the expense of his own interests; that, relying upon the representations contained in the letter, he, on December 16, 1882, purchased Lichtenthaler's interest, and that if he had known that no water could have been obtained, he would never have invested one dollar in these lands, which were valueless without irrigation.

James G. Welch, appearing as a witness for defendants, testified that his intention, which existed at the time and prompted the construction of the ditch, was to raise wheat to be ground in and thereby to keep his mill in operation, and to furnish water to irrigate lots in the town site of North Powder, of which he was the owner. Upon this subject, he testified as follows: Q. ''What object did you have in constructing that ditch?'' A. '' I constructed it to cover some desert lands. Lichtenthaler took up one section, and I took up the adjoining section; and I had land below—State lands. I took it out for the purpose of raising wheat for the mill; pretty good wheat land.'' * * * Q. ''And your purpose in making the appropriation of water, and diverting that water there and carrying it over to this land, was to irrigate the land so as to raise wheat on it?'' A. ''Yes, sir; good wheat land as there is in Powder River Valley.'' Q. ''That is, good wheat land provided it is irrigated properly?'' A. '' Yes, sir; good wheat land.'' Q. ''And you wanted to raise wheat for your mill?'' A. ''Yes, sir.'' * * * Q. ''Why did you want to raise wheat?'' A. '' Because I couldn't get wheat to run the mill. We didn't raise wheat enough there. I had

been getting my wheat from Grand Ronde Valley, generally, and when the railroad was completed I couldn't get wheat from Grand Ronde Valley without paying more than it was worth." * * * Q. "When you concluded to construct this irrigating ditch did you take into consideration the effect it would have upon your water power at the mill?" A. "Yes, sir; I did." Q. "Explain the matter now as you remember it." A. "The way I explain it is that I wanted to raise wheat to run the mill. The mill was no use without wheat. And then I expected to put in an engine to run the mill in winter. It always froze up on me. I conceded the same to Lichtenthaler; he wouldn't take hold of it until I did. That is why I conceded the same to Coughanour." * * * Q. "What, if anything, did the town site of North Powder have to do with the ditch?" A. "It had a good deal to do with it." Q. "Explain what it had to do with it." A. "It was of more importance to me than the mill and the whole business at that time; that is, the balance of the business. I expected to sell lots and furnish water to irrigate the lots. I had land there, considerable of it; besides, I had a half section of land that the ditch emptied out on at that time."

In the light of this testimony we will examine the legal principle applicable to the construction of the deed evidencing the transfer of the land and water right to Coughanour, with a view of ascertaining if possible the intention of the parties. When the intention of the parties to a deed is not discoverable from an inspection of the instrument, and proof of actual knowledge of the contracting parties with reference to the physical condition of the premises at the time of sale is unobtainable, the rule for determining such intention is to

invoke the presumption that the grantor intended to convey and the grantee to take the premises as they openly and visibly appeared at the time the sale thereof was consummated : *Knapp* v. *White*, 23 Conn. 529; *Cary* v. *Daniels*, 8 Metcalf 466 (41 Am. Dec. 532); *Dunklee* v. *Wilton R. R. Co.*, 24 N. H. 489; *Gillis* v. *Nelson*, 16 La. Ann. 275; *Vermont Central R. R. Co.* v. *Hills*, 23 Vt. 681. Mr. Devlin, in his work on Deeds (Vol. 2, § 841), illustrating this principle, says : " If by an artificial arrangement an owner of land has created an advantage for one part of the land to the detriment of the other, the holders of the two parts upon a severance of the ownership take them as they openly and visibly appeared at the time of the deed." To the same effect see also *Nicholas* v. *Chamberlain*, 3 Croke, 121; *United States* v. *Appleton*, 1 Sumner, 492; *New Ipswich Factory* v. *Batchelder*, 3 N. H. 190 (14 Am. Dec. 346); *Seymour* v. *Lewis*, 13 N. J. E. 439 (78 Am. Dec. 108); *Lapman* v. *Milks*, 21 N. Y. 505; *Curtiss* v. *Ayrault*, 47 N. Y. 73; *Heartt* v. *Kruger*, 121 N. Y. 386 (9 L. R. A. 135, 18 Am. St. Rep. 829, 24 N. E. 841); *Cave* v. *Crafts*, 53 Cal. 135; *Farmer* v. *Ukiah Water Co.*, 56 Cal. 11. In *Simmons* v. *Cloonan*, 47 N. Y. 3, it is held that the presumption of law, that when the owner of the whole tenement divides the same and conveys a portion the parties contract with reference to the visible physical condition of the property at the time, may be repelled by actual knowledge on the part of the contracting parties of facts which negative any deduction to be drawn from the apparent condition. The proof of actual knowledge of the contracting parties in reference to the physical condition of the premises conveyed is admissible only when the deed fails to express the intention in this respect, and hence, while such evidence repels the presumption which the law invokes, it does not tend to contradict the terms of a

written instrument, because they are not expressed therein : *Wilson* v. *Cochran,* 86 Am. Dec. 574.

It will be remembered that Welch's letter describes the land lying under the ditch as being well adapted to the growth of wheat, and his testimony shows that his desire to keep the mill in operation, and his inability to procure a supply of this cereal elsewhere, furnished the intent, and prompted him to seek the cultivation thereof, and as a means to that end it became necessary to construct the ditch in question. True, he states in his letter that the water not needed to irrigate the land which he owned, and that which he wanted Coughanour to purchase could be sold, but this must be understood to mean that the surplus could be supplied to others for irrigating land for the raising of wheat. Welch may have intended to furnish water by the ditch in question to irrigate town lots at North Powder which he expected to sell, but it is not claimed that defendants' land forms any part of the town site, and such being the case a fair construction of Welch's letter, as illustrated by his testimony, shows that the right intended to be conveyed to Coughanour was limited to the use of water to irrigate land for the growth of wheat. The irrigation season for wheat, as appears by the testimony, terminates about the first of July, prior to which there is usually an abundance of water flowing in North Powder River to supply all reasonable demands for that purpose, and to furnish sufficient quantity to operate the mill, and, this being so, the advantage conferred upon the arid land by the construction of the ditch was no detriment to the mill property, and hence the rule invoked has no application to the case at bar.

Defendants' counsel maintain that the evidence conclusively shows that prior to July 17, 1886, when Welch conveyed the town site of North Powder to Marshall,

Ramsey and Hall, the water right appurtenant to the flour mill had been severed therefrom, and the water, which from time immemorial flowed in the channel of North Powder River past the point where now is located the head gate of the mill race, had been diverted from Anthony Creek, and appropriated to the irrigation of arid land which was owned and claimed by Welch and Coughanour, and that the water thus diverted and appropriated became a part of said lands as appurtenant thereto; and, this being so, the court erred in refusing to grant their motion for a nonsuit. The evidence shows that on October 21, 1880, when Welch claims to have made the diversion by posting the notice, he owned only an undivided three-fourths interest in the flour mill, the remaining part being owned by one S. B. Baisley, from whom Welch obtained the title August 27, 1881. But, assuming that Welch, by this conveyance, obtained the ratification of his co-tenant in the impairment of the motive power of their mill, let us examine the deeds evidencing the several transfers by which Coughanour claims to have succeeded to the interest of his associates, and thereby acquired the prior right of diversion. The record before us contains no deed from Welch to Lichtenthaler conveying any interest in the ditch and water right, and Welch, in his letter to Coughanour, in speaking of the latter's purchase of Lichtenthaler's interest in said lands, says : " If you buy, I will give you a deed to a half of the ditch, if you pay half of the expense of what is back, which is $500," thus showing that, notwithstanding Lichtenthaler was interested with him in the ditch, Welch considered that he was the sole owner of the water right. True, Lichtenthaler, on December 16, 1882, executed to Coughanour a quitclaim deed to all his interest in the ditch, but the record fails to show that he had any interest therein, or that Welch

kept the promise contained in his letter, to execute to Coughanour a deed evidencing the transfer of Lichtenthaler's interest in the ditch; so that the first conveyance from Welch, in respect to any water privilege, was that of July 17, 1886, to Marshall, Ramsey and Hall, of his interest in the town site, grist mill, planer, etc., which, having been executed more than nine months prior to Coughanour's deed, it is quite evident that the court committed no error in denying said motion.

It is insisted by defendants' counsel that plaintiff is estopped by the conduct of Welch, its predecessor in interest, from interfering with or objecting to defendants' diverting the waters of said creek, not exceeding five hundred inches, miners' measurement, under six inches of pressure. If Coughanour, relying upon Welch's representations, materially aided the latter in constructing the ditch, whereby the water was diverted and appropriated for a particular purpose, the parol license thus granted, having been fully executed, would be irrevocable, in view of which the better reason in our judgment supports the theory that a court of equity would enjoin the licenser from interfering with the free exercise of the right he had thereby conferred: Washburn, Easem. *560; *Yunker* v. *Nichols*, 1 Colo. 551; *Schilling* v. *Rominger*, 4 Colo. 100; *De Graffenried* v. *Savage*, 9 Colo. App. 131 (47 Pac. 902); *Curtis* v. *La Grande Water Co.*, 20 Or. 34 (10 L. R. A. 404, 23 Pac. 808); *McBroom* v. *Thompson*, 25 Or. 559 (42 Am. St. Rep. 806, 37 Pac. 57); *Garrett* v. *Bishop*, 27 Or. 349 (41 Pac. 10). See also extended note to the case of *Lawrence* v. *Springer*, 31 Am. St. Rep. 702 (24 Atl. 933). If plaintiff mill company succeeded to Welch's interest with knowledge of the execution of his parol license, a court of equity would probably enjoin it from interfering with the exercise of such right. But, if this be true, plaintiff is not attempting to interfere with Coughanour's irriga-

tion of wheat land, and as this was the object for which Welch gave the parol license, it is evident that plaintiff is not estopped by the conduct of its predecessor in interest.

It is claimed that Coughanour by adverse user obtained a title to the water he diverted and appropriated. The evidence shows that on March 2, 1886, he applied the water to a beneficial use, but as there was no scarcity of that commodity until 1895, how can it be said that there was a hostile invasion of plaintiff's right prior thereto? Plaintiff having the right of prior appropriation of sufficient water to operate its mill, was not injured by any other diversion, so long as its demands were supplied: *Wimer* v. *Simmons*, 27 Or. 1 (50 Am. St. Rep. 685, 39 Pac. 6); *Anaheim Water Co.* v. *Semi-Tropic Water Co.*, 64 Cal. 185 (30 Pac. 623). The right of prior appropriation is incompatible with the doctrine of riparian proprietorship (Pomeroy on Riparian Rights, § 132; Kinney on Irrigation, § 272), and as Tartar, plaintiff's predecessor in interest, was the first settler upon the banks of that part of North Powder River, he had the privilege of making a prior and superior appropriation of its waters, or he could insist upon having the stream flow uninterruptedly in its channel through his land, subject, however, to the natural use of the water by upper riparian proprietors, and also to a reasonable use thereof by them in irrigating their lands, if the volume of water was sufficient to supply the natural wants of the different proprietors; but, having elected to divert the water, he could not thereafter stand upon his strict common law rights as a riparian proprietor: *Low* v. *Schaffer*, 24 Or. 239 (33 Pac. 678).

This being so, and plaintiff's demands having been supplied, it would seem that it could not enjoin Coughanour from diverting water for irrigation until there had

been some interruption of its use amounting to a depriva-
tion of its right, and to hold that Couganour, in the mean-
time, might obtain by adverse user a right to the water
so diverted would be equivalent to conceding that plain-
tiff without redress might be deprived of a valuable prop-
erty right by means of an invasion of which it was not
conscious. Plaintiff never having been injured by Cough-
anour's diversion until 1895, the statute of limitations
had not barred its right to equitable relief when this suit
was instituted.

It is conceded by defendant's counsel that Cough-
anour permitted sufficient water to pass the head gate of
his ditch to supply plaintiff's demand, and, after having
done so, the water was diverted and appropriated by
others before it reached plaintiff's mill race, and that,
having alleged these facts as a defense, the court erred
in sustaining a demurrer to that part of the answer.
The point contended for assumes that there is a defect of
parties defendant, which is not apparent from an inspec-
tion of the complaint, to correct which an answer is the
only available pleading, and, being in the nature of a
common law plea in abatement, it was incumbent upon
defendant, if it be assumed that the court in one suit
will settle the whole controversy, to name the parties
whom he claims are necessary to a proper adjudication
of the question, thus affording the plaintiff "a better
writ," and ask that they be brought in; but, having
failed to do so, defendant waived his right, if it existed,
and hence there was no error in sustaining the demurrer:
1 Chitty, Pleading, *446; Hawes, Parties to Actions,
§ 100; Bliss, Code Pleading (3 ed.), § 411; 1 Enc. Pl.
& Prac. 14, 17 and 25.

It is also maintained that Welch and his grantees had
no right to increase the appropriation of water in the
operation of the mill after Coughanour acquired a right

to divert and appropriate the water from Anthony Creek. The testimony on this branch of the case is very conflicting, Welch stating that prior to 1883 it required only three hundred inches of water, miners' measurement, to operate the flour mill successfully, but in that year, having placed a planer, shingle cutter and other machinery in a building below the mill, he was obliged to enlarge the race so as to make it capable of conducting five hundred inches of water, in order to propel the increased burden, and that the size of the mill race and its capacity to conduct water are double what they were when plaintiff obtained a title to the property; while the testimony of plaintiff's witnesses tends to show that, notwithstanding the race had been widened from a point about one-half a mile above down to the mill, and the dirt taken therefrom used to raise the embankment, so that the water in the race-way and penstock was deepened from nineteen to twenty feet, thereby permitting the current to pass freely under the ice, keeping the mill in operation in the winter, the gate at the head of the race is not as large as it was when first constructed; that it did not require so much water to operate the Flanagan turbine and the roller process and accompanying machinery as the "home made" wheel demanded to propel the burrs and old appliances, and that the increase in the mill's daily output is due to modern machinery and improved methods of manufacturing flour, and not to any increase in the volume of water or amount of power. The court found that it required one thousand inches of water properly to operate the old, and this quantity was necessary for the new wheel, and we think a preponderance of the testimony warrants this finding, and that the volume of water flowing through the head gate has not been increased. But if it be admitted that the quantity of water used at the mill is

greater than the original appropriation, Coughanour was not injured thereby, when it is remembered that it was originally intended that his appropriation should be limited to the irrigation of wheat land only.    For these reasons, it follows that the decree is affirmed.

AFFIRMED.