VAN DYKE et al. v. MIDNIGHT SUN MINING & DITCH CO.

(Circuit Court of Appeals, Ninth Circuit.    March 9, 1910.)

No. 1,698.

1. EMINENT DOMAIN (§ 253*)—APPEALABLE ORDERS—ALASKA CODE—CONDEMNATION PROCEEDINGS.

Civ. Code Alaska, c. 22, § 207, concerning eminent domain, provides for the making of findings of certain facts before the condemnation of land, and that "The plaintiff or the defendant, or any party interested in the proceedings, can appeal to the United States Circuit Court of Appeals for the Ninth Circuit from any finding or judgment made or rendered under this chapter as in other cases. Such appeal does not stay any further proceedings under this chapter." Held, that a party may appeal from such

findings and an order of condemnation based thereon without waiting for the assessment of damages.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 660–664; Dec. Dig. § 253.*]

2. WATERS AND WATER COURSES (§ 15*)—WATER RIGHTS IN ALASKA—LAW GOVERNING.

The common-law doctrine of riparian rights does not apply to the Seward Peninsula in Alaska; but the waters of nonnavigable streams on public lands are subject to appropriation for mining, agricultural, and other useful purposes, and the locator of a mining claim on such a stream acquires no riparian rights by reason of such location as against a prior appropriator. He is, however, entitled to the continued use of so much water as he has been diverting and applying to a beneficial use as against a subsequent appropriator; there being no law of the territory requiring posting or recording of the notices of such appropriation to give him a vested right thereto.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 7; Dec. Dig. § 15.*]

Hunt, District Judge, dissenting.

In Error to the District Court of the United States for the Second Division of the District of Alaska.

Proceeding by the Midnight Sun Mining & Ditch Company against S. P. Van Dyke and D. W. McKay under the eminent domain act of Alaska. From the findings and an order of condemnation, defendants bring error. Affirmed.

Elwood Bruner and J. Allison Bruner, for plaintiffs in error.

S. T. Jeffreys and James E. Fenton, for defendant in error.

Before GILBERT and ROSS, Circuit Judges, and HUNT, District Judge

ROSS, Circuit Judge. The plaintiffs in error are, and have been for a considerable period, the owners of certain placer mining claims on Big Hurrah creek, Alaska, so located as to cross that stream. They allege, and they gave evidence tending to show, that all the water of the creek is necessary for the proper working and developing of their claims. In 1902, after the location of these claims by the plaintiffs in error, the defendant in error posted notices near the creek and filed a claim in the recorder's office of the district setting forth that it had appropriated all the water of Big Hurrah creek. In pursuance of that notice, the defendant in error in the year 1904 constructed a ditch, tapping the creek above the plaintiffs in error's claims, and running for a distance of six or eight miles, by means of which ditch the defendant in error has been and is diverting all the water of the creek, thus depriving the plaintiffs in error of any of it. This ditch was constructed across the said mining claims of the plaintiffs in error. The evidence is conflicting as to whether, at the time of its construction, the plaintiffs in error objected thereto; but it does show, without conflict, that they subsequently denied the right of the defendant in error to run the ditch over their land, and demanded its removal. Whereupon the defendant in error brought the present suit to condemn a right of way for its ditch over the claims of the plaintiffs in error,

relying on chapter 22 of title 3 of an act entitled "An act making further provisions for the civil government of Alaska and for other purposes," approved June 6, 1900 (Act June 6, 1900, c. 786, 31 Stat. 522). In their answer the plaintiffs in error deny the right of the company to condemn such right of way and pray for a decree ordering the removal of the ditch and the payment of damages for the trespass committed by the company in running it on their lands. The court found that the company had a right to all of the water of Big Hurrah creek by virtue of its appropriation; that the use to which it was putting the water was a public use; and that a right of way across the plaintiffs in error's claims was necessary to the proper exercise of the public use. Accordingly, the court made an order of condemnation, and, a motion made by the plaintiffs in error for a new trial being overruled, they sued out the present writ of error to this court, which writ the defendant in error moved to dismiss, contending that the order or judgment complained of was interlocutory and not final, and that therefore the Court of Appeals is without jurisdiction.

The proceeding was under section 207 of chapter 22 of the Civil Code of Alaska, concerning eminent domain, which makes it necessary for the court to find certain facts before condemnation—among them: (1) That the use to which the property is to be applied is a use authorized by law. (2) That the taking is necessary to such use. (3) If already appropriated to some public use, that the public use to which it is to be applied is a more necessary public use.

It is upon findings so made that there is established a basis for further proceedings. The findings constitute the decision of the court upon the vital question of whether or not the property sought to be taken can be condemned at all. Congress evidently deemed them of great importance, for in the same clause of the Code making findings necessary it provided that:

"The plaintiff or the defendant, or any party interested in the proceedings, can appeal to the United States Circuit Court of Appeals for the Ninth Circuit from any finding or judgment made or rendered under this chapter as in other cases. Such appeal does not stay any further proceedings under this chapter."

While there may be an appeal from an assessment made by commissioners after damages are assessed, nevertheless this right to have the findings and order of condemnation reviewed by this court is given in plain language. The requirement that the appeal shall be "as in other cases" refers to the practice in the mode of taking the appeal, rather than to cases wherein an appeal may lie. We find, too, that the whole of section 207 of the Code of Alaska, as we have cited it, was taken from the Code of Civil Procedure of Montana, where it can be found in section 7334, title 7, "Eminent Domain," Rev. Codes Mont. 1907, or section 2214, Codes Mont. adopted in 1895. The Supreme Court of Montana directly construed the statute in State ex rel. Davis v. District Court, 29 Mont. 153, 74 Pac. 200, and held that a defendant had a right of appeal from an order of condemnation made upon findings under the statute referred to, and before damages were assessed; and in Helena Power Transmission Co. v. Spratt et al., 35

Mont. 108, 88 Pac. 773, 8 L. R. A. (N. S.) 567, appeal was also taken from a judgment or order appointing commissioners after findings had been made.

As these interpretations of the statute conform to our own views, we overrule the motion to dismiss the writ of error and pass to the merits of the case.

The counsel for the plaintiffs in error are mistaken in saying, as they do, that the evidence introduced in the cause conclusively shows that the diversion of the waters of Big Hurrah creek by the plaintiff was not for any public use, but solely for its own purposes. If so, as a matter of course, the plaintiff had no right of condemnation. But we think the evidence was sufficient to justify the finding of the court to the effect that the plaintiff's appropriation of waters of Hurrah creek was made not only for its own benefit, but also in behalf of a public use. In pursuance of that appropriation, the plaintiff did supply the public with such waters, as the proof shows, and can be compelled to do so to the extent of its supply. That the plaintiff was incorporated for that purpose, among others, is also found by the trial court, and it hardly needs be said, in view of the provisions of section 204, c. 22, of the Alaska Code, which provides that the law of eminent domain may be exercised in behalf of "canals, ditches, flumes, aqueducts, and pipes for public transportation, supplying mines and farming neighborhoods with water, and sites for reservoirs necessary for collecting and storing water; roads, tunnels, ditches, flumes, pipes and dumping places for working mines," that the plaintiff's appropriation in question was in behalf of a public use.

It is, however, a conceded fact in the case that, prior to the appropriation under which the plaintiff claims, the placer mining claims held by the plaintiffs in error were located across Hurrah creek below the point of the defendant in error's subsequent diversion, and if it be true, as is contended on behalf of the plaintiffs in error, that the common-law doctrine of riparian rights applies to the case, it would follow that the defendant in error had no right to divert any of the water from the creek above their claims. Apart from the fact that the court will take judicial notice of the climatic and physical conditions of the Seward Peninsula, on and in which the properties in question are situate, the evidence presented to the court below shows without conflict that that Peninsula is valuable chiefly, if not entirely, for its gold and other mineral deposits, much of it being in benches remote from the streams, and that water is essential to the washing out and procuring of the gold. Indeed, in few, if any, sections of the various mining states and territories, is water more essential for that purpose than in Alaska. To states and territories so circumstanced, it has long been settled that the common-law doctrine of riparian rights is inapplicable. It is true that a provision of the statutes of Alaska, to wit, section 367, puts in force therein a portion of the common law, but only "so much of the common law as is applicable, and not inconsistent with the Constitution of the United States, or with any law passed or to be passed by Congress."

In the case of Atchison v. Peterson, 20 Wall. 511, 22 L. Ed. 414, the Supreme Court of the United States held that, as respects the use of

water for mining purposes throughout the Pacific states and territories, the doctrines of the common law declaratory of the rights of riparian owners were, at an early day after the discovery of gold, found to be inapplicable, or applicable only in a very limited extent, to the necessities of miners, and inadequate to their protection. "By the common law," said the court, "the riparian owner on a stream not navigable takes the land to the center of the stream, and such owner has the right to the use of the water flowing over the land as an incident to his estate. And as all such owners on the same stream have an equality of right to the use of the water as it naturally flows, in quality, and without diminution in quantity, except so far as such diminution may be created by a reasonable use of the water for certain domestic, agricultural, or manufacturing purposes, there could not be, according to that law, any such diversion or use of the water by one owner as would work material detriment to any other owner below him. Nor could the water by one owner be so retarded in its flow as to be thrown back to the injury of another owner above him."

In the subsequent case of Basey v. Gallagher, 20 Wall. 682, 22 L. Ed. 452, the court held that the views expressed and rulings made in the case of Atchison v. Peterson "are equally applicable to the use of water on the public lands for purposes of irrigation."

Again, in Broder v. Water Company, 101 U. S. 276, 25 L. Ed. 760, the court said:

"It is the established doctrine of this court that rights of miners who had taken possession of mines and worked and developed them, and the rights of persons who had constructed canals and ditches to be used in mining operations and for purposes of agricultural irrigation in the region where such artificial use of the water was an absolute necessity, are rights which the government had by its conduct recognized and encouraged, and was bound to protect, before the act of 1866"

—referring to the act of Congress of July 26, 1866 (14 Stat. 253, c. 262 [U. S. Comp. St. 1901, p. 1437]), the ninth section of which contains this declaration:

"That wherever by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes have vested and accrued, and the same are recognized and acknowledged by the local customs, laws and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; and the right of way for the construction of ditches and canals, for the purposes aforesaid, is hereby acknowledged and confirmed."

And the court added:

"We are of opinion that the section of the act which we have quoted (the ninth) was rather a voluntary recognition of a pre-existing right of possession, constituting a valid claim to its continued use, than the establishment of a new one."

The court, accordingly, in the Broder Case, without regard to the act of 1866, protected the right of the defendant to divert the water there in question from its natural channel, upon the ground that the government had, by its conduct, recognized and encouraged, and was bound to protect, such diversions. It was this principle of appropriation, and nothing else, that secured the defendant in the case of Broder

v. Water Company in the continued enjoyment of the water it had appropriated as against a grant from the government antedating the act of 1866, for the court there in terms declares:

"We do not think that the defendant is under the necessity of relying on that statute."

The defendant had acquired the right to divert the water from its natural channel and appropriate it to a useful purpose, because the government by its conduct through a long series of years, in view of the necessities of the country, which were widely different from those of the country from which the common law was taken, had recognized and encouraged such diversions and use of the waters upon the public lands. The government permitted the principle of appropriation of such waters to grow up and become a part of the law in relation to the public lands, and therefore, in construing the grant from the government, the court considered it with reference to the principle of appropriation, and protected the rights of the defendant which arose under and by virtue of that principle.

The decisions of the Supreme Court of the United States to which reference has been made are in line with and confirmation of numerous state decisions. In People v. Canal Appraisers, 33 N. Y. 482, the Court of Appeals of New York quoted with approval this language of Judge Bronson:

"I think no doctrine better settled than that such portions of the law of England as are not adapted to our condition form no part of the law of this state. This exception includes not only such laws as are inconsistent with the spirit of our own institutions, but such as were framed with special reference to the physical condition of a country differing widely from our own. It is contrary to the spirit of the common law itself to apply a rule founded upon a particular reason to a law when that reason utterly fails. 'Cessante ratione legis, cessat ipsa lex.'"

In McClintock v. Bryden, 5 Cal. 100, 63 Am. Dec. 87, the Supreme Court of California said:

"The wants and interests of a country have always had their due weight upon courts in applying principles of law which should shape its conditions; and rules must be relaxed, the enforcement of which would be entirely unsuited to the interests of the people they are to govern."

From the beginning, in the arid regions of the western states and territories, it has been the custom of the people to divert from their natural channels the waters of the streams upon the public lands, and appropriate the same to the purposes of mining, agriculture, and other useful and beneficial uses. In Irwin v. Phillips, 5 Cal. 140, 63 Am. Dec. 113, after stating that a system of rules had been permitted to grow up with respect to mining on the public lands by the voluntary action and assent of the population, whose free and unrestrained occupation of the mineral region had been tacitly assented to by the federal government, and heartily encouraged by the expressed legislative policy of the state, the court said:

"So fully recognized have become these rights, and without any specific legislation conferring or confirming them, they are alluded to and spoken of in various acts of the Legislature in the same manner as if they were rights

which had been vested by the most distinct expression of the will of the lawmakers."

The common-law doctrine of riparian rights being wholly inconsistent with and antagonistic to that of appropriation, it necessarily follows that when the federal and state governments assented to, recognized, and confirmed, with respect to the waters upon the public lands, the doctrine of appropriation, they in effect declared that that of riparian rights did not apply. The doctrine of appropriation thus established was not a temporary thing, but was one born of the necessities of the country and its people, was the growth of years, permanent in its character, and fixed the status of water rights with respect to public lands.

So, in the very recent case of Boquillas Land & Cattle Co. v. Curtis et al., 213 U. S. 338, 345, 29 Sup. Ct. 493, 494, 53 L. Ed. 822, the Supreme Court, in considering a similar question that arose in Arizona, said, among other things:

"But, perhaps, the main contention of the plaintiff is based on the legislation of the territory, and especially on Howell Code 1864, c. 61, § 7, as follows: 'The common law of England, so far as it is not repugnant to, or inconsistent with the Constitution and laws of the United States, or the bill of rights or laws of this territory, is hereby adopted, and shall be the rule of decision in all courts of this territory.' We assume that this section, however it may affect the case at bar, was within the power of the Legislature to enact. (Citing cases.) But we agree with the territorial court that, construed with the rest of the Code, it is far from meaning that patentees of a ranch on the San Pedro are to have the same rights as owners of an estate on the Thames."

And that Congress itself has by legislation, in effect, declared that the common-law doctrine does not apply to the waters of the non-navigable streams upon the public lands in the arid portions of the western states and territories, but that such waters in those regions may be appropriated and diverted for mining, agricultural, and other useful purposes, is further shown by the cases of United States v. Rio Grande Irrigation Co., 171 U. S. 690, 704, 705, 706, 19 Sup. Ct. 770, 43 L. Ed. 1136, and Gutierres v. Albuquerque Land Co., 188 U. S. 545, 23 Sup. Ct. 338, 47 L. Ed. 588, both of which cases arose in New Mexico, and Bear Lake Irrigation Co. v. Garland, 164 U. S. 1, 18, 17 Sup. Ct. 7, 41 L. Ed. 327.

We are of the opinion that the plaintiffs in error in the present case acquired, by virtue of the placer mining locations held by them, no riparian rights in or to the waters of Hurrah creek. They undoubtedly had the right to appropriate such of the unappropriated waters of that stream as were needed in and for the working of their mining claims; and the record here shows that it appeared in evidence before the court below:

"That S. P. Van Dyke and D. W. McKay were the owners of placer claims Nos. 9 and 10, that Ingobar Johnson and others were the owners of placer claims numbered 7 and 8, that Assyria Hall and others were the owners of placer claim No. 6, all on Big Hurrah creek, and that they and their grantors were such owners at the time the water ditch mentioned in the complaint was constructed, and were the owners at the time and prior to the alleged location of the waters of Big Hurrah creek by the plaintiffs herein, and its grantor, and that each and all of them were using the waters of said creek more or less for mining purposes."

There is nothing, however, in the evidence, nor, indeed, in the pleading of the plaintiffs in error, tending to show the amount of the water of the creek they had diverted for beneficial purposes prior to the appropriation under which the defendant in error claims. Inasmuch as the statutes of Alaska make no provision respecting the necessity of either the posting or recording of notices of appropriation of waters upon the public land, we think no such notice essential to the validity of a bona fide diversion of such waters for a beneficial use in Alaska, and therefore, in the final judgment to be entered in this cause, care should be taken to provide that it be without prejudice to any rights the plaintiffs in error may be able to establish to any of the waters of Hurrah creek by virtue of any appropriation made by them, or those under whom they claim, for beneficial uses, prior to the appropriation under which the defendant in error holds.

The order is affirmed, with directions so to provide in any final decree hereafter to be entered in the cause.

HUNT, District Judge (dissenting). I agree that the motion to dismiss the writ of error should be overruled. I agree, too, with the views of the majority in so far as they hold that the doctrine of riparian rights, as known to the common law, is inapplicable to the conditions existing in the semiarid states and territories. I might even go so far as to say that that doctrine may perhaps be inapplicable to conditions existing in parts of Alaska, but for reasons hereinafter stated I believe that it was the intent and spirit of the act of Congress relating to Alaska that rights in and to property there situated should, generally speaking, and so far as applicable, be governed by the rule of decision laid down by the Supreme Court of Oregon.

It is evident, from the record, that the lower court proceeded upon the theory that the plaintiffs in error had no riparian rights in the Big Hurrah creek by virtue of the location of their placer mining claims, and that the defendant in error, by its declaration of a water right and construction of a ditch and diversion of water, even though all these acts were had and done subsequent to the location of the placer mining claims of plaintiffs in error, was a bona fide lawful appropriator, and as such could condemn a right of way for its ditch.

The Code of Alaska has no specific provisions with respect to the location of water rights. In the Political Code (section 15, p. 137, Carter's Ann. Alaska Cases) there are provisions defining what instruments are subject to record, which include notices and declarations of water rights. But a statute making it the duty of a recording officer to record a notice or declaration of a water right is of little or no aid in determining whether the placer mine owners in the present case can claim riparian rights as against the defendant in error. We find assistance, however, in section 367, Civ. Code Alaska, which provides that:

"So much of the common law as is applicable and not inconsistent with the Constitution of the United States or with any law passed or to be passed by the Congress is adopted and declared to be law within the District of Alaska."

Here was a declaration to the effect that riparian rights, as known at common law, do exist in Alaska to the extent to which the law of such rights is applicable and not inconsistent with other acts of Congress.

The question is, then: To what extent and in what nature, if at all, is the common-law doctrine of riparian rights applicable? The act of Congress, "An act providing a civil government for Alaska" (chapter 53, 23 Stat. U. S. p. 24), makes the general laws of Oregon obtain in Alaska so far as the same may be applicable and not in conflict with the provisions of the laws of the United States. No statute of Oregon is directly pertinent; but we find that the rights of riparian owners in that state have been well established by judicial interpretation which, I think, may well be adopted as applicable to Alaska, where well-known climatic conditions are not unlike those of Oregon and Washington. In Brown v. Baker, 39 Or. 66, 65 Pac. 799, the rule recognized in that state is thus declared:

"The water of a nonnavigable stream is an incident to the soil through which it flows, and, as the United States is the primary proprietor of public lands, its grant of the waters thereof, in the Pacific Coast states, to the person having the priority of its possession (14 Stat. 253, c. 262), in the absence of a constitutional provision or statute declaring water to be public property, necessarily cuts off the right of a subsequent settler to divert the water under a claim of prior appropriation. Title by relation gives to the first settler upon the public land the priority of possession of the water flowing through the same (Faull v. Cooke, 19 Or. 455, 26 Pac. 662, 20 Am. St. Rep. 836; Larsen v. Navigation Co., 19 Or. 240, 23 Pac. 974; Johnson v. Lumbering Co., 24 Or. 182, 33 Pac. 528; Cole v. Logan, 24 Or. 304, 33 Pac. 568), though he may never appropriate the water to a beneficial use. If a lower riparian proprietor had acquired a right to the waters of Willow creek prior to the plaintiff's diversion, such right would necessarily defeat their appropriation of the water, because the stream at the time of the diversion was not flowing through public lands. The right of prior appropriation is limited to the use of water by the pioneer settler before any adverse claims of riparian proprietors attach to the stream from which the water is taken, and not to the points of diversion, which may be either within or beyond the boundaries of the tract selected by such settler. * * * The first settler upon public land through which a stream of water flows may either divert the water and use it for a beneficial purpose, or exercise the common-law right prevailing in the Pacific Coast states, where the modified rule of riparian ownership is still in force, and insist that the stream shall flow in its natural channel undiminished in quantity, except when applied to the natural use of the upper riparian proprietors, and for irrigation if the stream affords a sufficient quantity of water for the latter purpose. Low v. Schaffer, 24 Or. 239, 33 Pac. 678; Milling Co. v. Coughanour, 34 Or. 9, 54 Pac. 223."

The plaintiffs there contended that there was no proof of a diversion in accordance with any local custom or law, as contemplated by the act of Congress of July 26, 1866 (supra), and the court said:

"The act of Congress to which reference is made provides that whenever, by priority of possession, rights to the use of water for mining, agriculture, manufacturing, or other purposes have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same. The water rights thus granted were limited by Congress to territory in which the local customs, laws, and decisions of the courts recognized and enforced the principle that a superior right to the use of water flowing through public land was secured by priority of possession."

So, in the case under consideration, there is no proof of diversion under any local custom or law.

In North Powder Milling Co. v. Coughanour, 34 Or. 9, 54 Pac., page 223, the court said:

"The right of prior appropriation is incompatible with the doctrine of riparian proprietorship (Pom. Rip. Rights, § 132; Kin. Irr. § 272), and as Tartar, plaintiff's predecessor in interest, was the first settler upon the banks of that part of North Powder river, he had the privilege of making a prior and superior appropriation of its waters, or he could insist upon having the stream flow uninterruptedly in its channel through his land, subject, however, to the natural use of the water by upper riparian proprietors, and also to a reasonable use thereof by them in irrigating their lands, if the volume of the water was sufficient to supply the natural wants of the different proprietors; but, having elected to divert the water, he could not thereafter stand upon his strict common-law rights as a riparian proprietor. Low v. Schaffer, 24 Or. 239, 33 Pac. 678."

In Low v. Schaffer, 24 Or. 239, 33 Pac. 678, the Supreme Court also recognized the right of a riparian proprietor to the ordinary use of the water flowing past his land for the purpose of supplying his natural wants, and to the use of a reasonable quantity for irrigating his land, if there be sufficient to supply the natural wants of the different proprietors.

I would say, however, that in my judgment the enjoyment of the right of the riparian proprietor goes no farther than for a reasonable use, always keeping in mind the rights of others, so that as many as possible may participate in the benefits of the use of the water. In applying the common-law rules to Alaska, I think it is no strain of principle to hold that a use there for mining is as reasonable as is a use for irrigation in Oregon. The principles of the common law are not prohibitive of a reasonable use for either purpose, and the courts should not attempt to make classifications of uses without cautious regard for the circumstances and physical condition of that section of the country to be affected. Weil on Water Rights, p. 370; Farnham on Waters, § 650; Union Mill & Mining Co. v. Dangberg, 81 Fed. 73.

If I am right in taking the rule of the common law, as modified in interpretation by the Supreme Court of Oregon, to be the proper one to sustain as applicable to Alaska, it should follow, I think, that, the plaintiffs in error being locators of placer mining claims bordering upon a stream within the public domain before defendant in error made any appropriation of the water of the stream, defendant's subsequent appropriation should be held to be subject to the prior rights of plaintiffs in error and to the riparian rights belonging to plaintiffs in error as locators.

I think it should also follow that inasmuch as the theory upon which the lower court proceeded was wrong in ignoring the fundamental rights of the plaintiffs in error, which, under the evidence, called for the use of all the water in the creek, the order of condemnation should be set aside, and a new trial ordered, with the right accorded to the defendant in error to amend its allegations and proof with a view to establishing rights under the laws of eminent domain.