CALIFORNIA OREGON POWER CO. *v.* BEAVER PORTLAND CEMENT CO. ET AL.

No. 612. Argued April 5, 8, 1935.—Decided April 29, 1935.

---

144

*Mr. A. E. Reames* for petitioner.

146

148

*Mr. W. Lair Thompson* for respondents.

MR. JUSTICE SUTHERLAND delivered the opinion of the Court.

This is a suit brought by petitioner in a federal district court for Oregon against respondents, to enjoin them from interfering with the waters of Rogue River, in the State of Oregon, in any such way as to lessen the volume which flows over and along petitioner's land, and particularly

from carrying on any drilling or blasting operations in the bed of the stream or removing rocks or other material therefrom. Following a trial, the district court made findings of fact and entered a decree denying the relief prayed for, except that respondents were enjoined from so carrying into effect their operations as to reduce the level of Rogue River below a designated elevation above sea level, and in another particular not necessary to be stated. The Circuit Court of Appeals affirmed the decree, 73 F. (2d) 555; and we brought the case here on certiorari.

Rogue River is a non-navigable stream, and in its course flows through and between lands of petitioner on the east bank of the river and lands of respondents upon the west bank, the thread of the stream being the boundary between the two. Petitioner's lands were acquired by a predecessor in interest in 1885 by patent from the United States under the Homestead Act of May 20, 1862. The lands were purchased by petitioner and conveyed to it in 1921. Petitioner is a public-service corporation engaged in manufacturing and supplying electrical current to its customers. The City of Gold Hill, a municipal corporation, owns the lands on the west side of the river, and the Beaver Portland Cement Company is in possession of them, together with certain adjudicated water rights and permits issued from the office of the state engineer, under a contract of sale from the city. The blasting complained of was all west of the thread of the stream, on respondents' property, and was for the double purpose of freeing the channel, incident to the use of the water rights adjudicated and permitted, and securing broken stone for a dam to be used in connection with a power plant which the cement company was about to build.

Neither petitioner nor any of its predecessors in interest has ever diverted the waters of the river for beneficial use on the real property or sought to make an actual appropriation thereof. The sole claim is based upon the

common-law rights of a riparian proprietor, which petitioner says attached to the lands when the patent was issued to its first predecessor in title.

Petitioner insists that prior to the adoption of the Oregon Water Code of 1909, *infra,* the common-law rule that the riparian owner was entitled to the natural flow of the stream across or along the border of his land in its accustomed channel was recognized and in full force in the State of Oregon. Respondents contend to the contrary. Both cite many Oregon decisions and argue the matter at length. But an examination of the authorities leaves the question in doubt. In dealing with cases where the parties making conflicting claims were both riparian owners, the doctrine of the common law seems to have been recognized. Other cases appear to accept what is called a modified form of the common-law rule; and still other decisions apparently enforce the rule of appropriation. It is suggested by respondent that, prior to the adoption of the Water Code in 1909, the policy in respect of water rights was developing and the law on the subject of riparian rights was in a state of flux. There appears to be reason in the suggestion. But, in view of the conclusion to which we have come, it is unnecessary to pursue the inquiry further.

In 1909, the Water Code was adopted by the state legislature. Ore. Laws, 1909, Chap. 216. The act provides that all water within the state shall be subject to appropriation for beneficial use; but nothing therein is to be construed to take away or impair any vested right. In respect of a riparian proprietor, a vested right is defined "as an actual application of water to beneficial use prior to the passage of this act . . . to the extent of the actual application to beneficial use." The Code provides for the adjudication of water rights upon a petition to the state engineer. And any court in which suit is brought to determine such rights may, in its discretion, transfer

the case to the state engineer for determination. But no decision of the state engineer is to become final until confirmed by the court designated as having jurisdiction under the act. The procedural provisions of the act have been sustained as constitutional by this court. *Pacific Live Stock Co.* v. *Lewis,* 241 U. S. 440.

The court below held (1) that the homestead patent of 1885 carried with it the common-law right to have the stream continue to flow in its accustomed channel, without substantial diminution; but (2) that, while this was a substantial property right which could not be arbitrarily destroyed, it nevertheless was subject to the police power of the state and might be modified by legislation passed in the interest of the general welfare; and upon the latter ground the Water Code was upheld and the claims of respondents sustained.

*First.* The first question is of especial importance to the semi-arid states of California, Oregon and Washington, where climatic conditions in some sections so differ from those in others that the doctrine of the common law may be of advantage in one instance, and entirely unsuited to conditions in another. Probably, it was this diversity of conditions which gave rise to more or less confusion in the decisions—not only of Oregon, but of California—in respect of the subject. We have already spoken of the former; and one has only to compare the decision of the Supreme Court of California in *Lux* v. *Haggin,* 69 Cal. 255; 4 Pac. 919; 10 Pac. 674, with *Modoc L. & L. S. Co.* v. *Booth,* 102 Cal. 151; 36 Pac. 431, to realize that the rule with respect to the extent of the application of the common law of riparian rights is, likewise, far from being clear in the latter.

The question with which we are here primarily concerned is whether—in the light of pertinent history, of the conditions which existed in the arid and semi-arid land states, of the practice and attitude of the federal

government, and of the congressional legislation prior to 1885—the homestead patent in question carried with it as part of the granted estate the common-law rights which attach to riparian proprietorship. If the answer be in the negative, it will be unnecessary to consider the second question decided by the court below.

For many years prior to the passage of the Act of July 26, 1866, c. 262, § 9, 14 Stat. 251, 253, the right to the use of waters for mining and other beneficial purposes in California and the arid region generally was fixed and regulated by local rules and customs. The first appropriator of water for a beneficial use was uniformly recognized as having the better right to the extent of his actual use. The common law with respect to riparian rights was not considered applicable, or, if so, only to a limited degree. Water was carried by means of ditches and flumes great distances for consumption by those engaged in mining and agriculture. *Jennison* v. *Kirk*, 98 U. S. 453, 457–458. The rule generally recognized throughout the states and territories of the arid region was that the acquisition of water by prior appropriation for a beneficial use was entitled to protection; and the rule applied whether the water was diverted for manufacturing, irrigation, or mining purposes. The rule was evidenced not alone by legislation and judicial decision, but by local and customary law and usage as well. *Basey* v. *Gallagher*, 20 Wall. 670, 683–684; *Atchison* v. *Peterson*, 20 Wall. 507, 512–513.

This general policy was approved by the silent acquiescence of the federal government, until it received formal confirmation at the hands of Congress by the Act of 1866, *supra*. *Atchison* v. *Peterson, supra*. Section 9 of that act provides:

" That whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes, have vested and accrued, and the same

are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; and the right of way for the construction of ditches and canals for the purposes aforesaid is hereby acknowledged and confirmed: . . ."

This provision was "rather a voluntary *recognition of a pre-existing right of possession,* constituting a valid claim to its continued use, than the establishment of a new one." *Broder* v. *Water Co.,* 101 U. S. 274, 276; *United States* v. *Rio Grande Irrigation Co.,* 174 U. S. 690, 704–705. And in order to make it clear that the grantees of the United States would take their lands charged with the existing servitude, the Act of July 9, 1870, c. 235, § 17, 16 Stat. 217, 218, amending the Act of 1866, provided that—

" . . . all patents granted, or preëmption or homesteads allowed, shall be subject to any vested and accrued water rights, or rights to ditches and reservoirs used in connection with such water rights, as may have been acquired under or recognized by the ninth section of the act of which this act is amendatory."

The effect of these acts is not limited to rights acquired before 1866. They reach into the future as well, and approve and confirm the policy of appropriation for a beneficial use, as recognized by local rules and customs, and the legislation and judicial decisions of the arid-land states, as the test and measure of private rights in and to the non-navigable waters on the public domain. *Jones* v. *Adams,* 19 Nev. 78, 86; 6 Pac. 442; *Jacob* v. *Lorenz,* 98 Cal. 332, 335–336; 33 Pac. 119.

If the acts of 1866 and 1870 did not constitute an entire abandonment of the common-law rule of running waters in so far as the public lands and subsequent grantees thereof were concerned, they foreshadowed the more positive declarations of the Desert Land Act of 1877, which it is contended did bring about that result. That

**156**

act allows the entry and reclamation of desert lands within the states of California, Oregon, and Nevada (to which Colorado was later added), and the then territories of Washington, Idaho, Montana, Utah, Wyoming, Arizona, New Mexico, and Dakota,[1] with a proviso to the effect that the right to the use of waters by the claimant shall depend upon *bona fide* prior appropriation, not to exceed the amount of waters actually appropriated and necessarily used for the purpose of irrigation and reclamation. Then follows the clause of the proviso with which we are here concerned:

". . . all surplus water over and above such actual appropriation and use, together with the water of all lakes, rivers and other sources of water supply upon the public lands and not navigable, shall remain and be held free for the appropriation and use of the public for irrigation, mining and manufacturing purposes subject to existing rights." Ch. 107, 19 Stat. 377.

For the light which it will reflect upon the meaning and scope of that provision and its bearing upon the present question, it is well to pause at this point to consider the then-existing situation with respect to land and water rights in the states and territories named. These states and territories comprised the western third of the United States—a vast empire in extent, but still sparsely settled. From a line east of the Rocky Mountains almost to the Pacific Ocean, and from the Canadian border to the boundary of Mexico—an area greater than that of the original thirteen states—the lands capable of redemption, in the main, constituted a desert, impossible of agricultural use without artificial irrigation.

In the beginning, the task of reclaiming this area was left to the unaided efforts of the people who found their way by painful effort to its inhospitable solitudes. These

---

[1] Later to become the states of North and South Dakota.

western pioneers, emulating the spirit of so many others who had gone before them in similar ventures, faced the difficult problem of wresting a living and creating homes from the raw elements about them, and threw down the gage of battle to the forces of nature. With imperfect tools, they built dams, excavated canals, constructed ditches, plowed and cultivated the soil, and transformed dry and desolate lands into green fields and leafy orchards. In the success of that effort, the general government itself was greatly concerned—not only because, as owner, it was charged through Congress with the duty of disposing of the lands, but because the settlement and development of the country in which the lands lay was highly desirable.

To these ends, prior to the summer of 1877, Congress had passed the mining laws, the homestead and preëmption laws, and finally, the Desert Land Act. It had encouraged and assisted, by making large land grants to aid the building of the Pacific railroads and in many other ways, the redemption of this immense landed estate. That body thoroughly understood that an enforcement of the common-law rule, by greatly retarding if not forbidding the diversion of waters from their accustomed channels, would disastrously affect the policy of dividing the public domain into small holdings and effecting their distribution among innumerable settlers. In respect of the area embraced by the desert-land states, with the exception of a comparatively narrow strip along the Pacific seaboard, it had become evident to Congress, as it had to the inhabitants, that the future growth and well-being of the entire region depended upon a complete adherence to the rule of appropriation for a beneficial use as the exclusive criterion of the right to the use of water. The streams and other sources of supply from which this water must come were separated from one another by wide stretches of parched and barren land which never could be made to produce agricultural crops except by the

transmission of water for long distances and its entire consumption in the processes of irrigation. Necessarily, that involved the complete subordination of the common-law doctrine of riparian rights to that of appropriation. And this substitution of the rule of appropriation for that of the common law was to have momentous consequences. It became the determining factor in the long struggle to expunge from our vocabulary the legend "Great American Desert," which was spread in large letters across the face of the old maps of the far west.

In the light of the foregoing considerations, the Desert Land Act was passed, and in their light it must now be construed. By its terms, not only all surplus water over and above such as might be appropriated and used by the desert-land entrymen, but "the water of all lakes, rivers and other sources of water supply upon the public lands and not navigable" were to remain "free for the appropriation and use of the public for irrigation, mining and manufacturing purposes." If this language is to be given its natural meaning, and we see no reason why it should not, it effected a severance of all waters upon the public domain, not theretofore appropriated, from the land itself. From that premise, it follows that a patent issued thereafter for lands in a desert-land state or territory, under any of the land laws of the United States, carried with it, of its own force, no common law right to the water flowing through or bordering upon the lands conveyed. While this court thus far has not found it necessary to determine that precise question, its words, so far as they go, tend strongly to support the conclusion which we have suggested.

In *United States* v. *Rio Grande Irrigation Co.,* 174 U. S. 690, the government sought to enjoin the irrigation company from constructing a dam across the Rio Grande in the Territory of New Mexico, and from appropriating the waters of that stream. The object of the com-

pany was to impound the waters and distribute the same for a variety of purposes. The company defended on the ground that the site of the dam was within the arid region, and that it had fully complied with the water laws of the Territory of New Mexico in which the dam was located and the waters were to be used. The supreme court of the territory affirmed a decree dismissing the bill. This court reversed and remanded the case, with instructions to inquire whether the construction of the dam and appropriation of water would substantially diminish the navigability of the stream, and, if so, to enter a decree restraining the acts of the appellees to the extent of the threatened diminution. The opinion, dealing with the question of riparian rights, said that it was within the power of any state to change the common-law rule and permit the appropriation of the flowing waters for any purposes it deemed wise. Whether a territory had the same power the court did not then decide. Two limitations of state power were suggested: first, in the absence of any specific authority from Congress, that a state could not by its legislation destroy the right of the United States as the owner of lands bordering on a stream to the continued flow—so far, at least, as might be necessary for the beneficial use of the government property; and second, that its power was limited by that of the general government to secure the uninterrupted navigability of all navigable streams within the limits of the United States. With these exceptions, the court, however, thought (p. 706) that by the acts of 1866 and 1877 " Congress recognized and assented to the appropriation of water in contravention of the common law rule as to continuous flow," and that " the obvious purpose of Congress was to give its assent, so far as the public lands were concerned, to any system, although in contravention to the common law rule, which permitted the appropriation of those waters for legitimate industries." And see

*Bean* v. *Morris,* 221 U. S. 485, 487; *Van Dyke* v. *Midnight Sun Mining & Ditch Co.,* 177 Fed. 85, 88–91.

In *Gutierres* v. *Albuquerque Land Co.,* 188 U. S. 545, it was held that the acts of 1866 and 1877 recognized, in respect of the public domain, the validity of the local customs, laws and decisions of the *territories* as well as of the states in respect of the appropriation of waters, and granted the right to appropriate such quantity as might be necessarily used to irrigate and reclaim desert land, and the right of the public to use the surplus for irrigation, mining, and manufacturing purposes subject to existing rights.

In *Boquillas Cattle Co.* v. *Curtis,* 213 U. S. 339, this court, while finding it unnecessary to decide whether lands in the arid regions patented after the Desert Land Act were accepted subject to the rule that priority of appropriation gives priority of right, said that the decision of the Supreme Court of Oregon to that effect in *Hough* v. *Porter, infra,* proceeded " on plausible grounds."

And in *Schodde* v. *Twin Falls Water Co.,* 224 U. S. 107, 122, an Idaho case which sharply presented conflicting claims under the common-law rule and the rule of appropriation, this court held that such common-law rights as were incompatible with the rule of prior appropriation for beneficial use could not coexist with the latter system.

Only four of the desert-land states have spoken upon the matter, and their decisions are not in harmony. The Supreme Court of Oregon in *Hough* v. *Porter,* 51 Ore. 318; 95 Pac. 732; 98 Pac. 1083; 102 Pac. 728, held that the legal effect of the language already quoted from the Desert Land Act was to dedicate to the public all interest, riparian or otherwise, in the waters of the public domain, and to abrogate the common-law rule in respect of riparian rights as to all lands settled upon or entered after March 3, 1877. The supplemental opinion which deals with the subject beginning at p. 382 is well reasoned, and

we think reaches the right conclusion. Subsequent decisions in Oregon are to the same effect. *Hedges* v. *Riddle*, 63 Ore. 257, 259–260; 127 Pac. 548; *Hill* v. *American Land & Livestock Co.*, 82 Ore. 202, 207; 161 Pac. 403; *Allen* v. *Magill*, 96 Ore. 610, 618–619; 189 Pac. 986; 190 Pac. 726.

This view was followed by the Supreme Court of South Dakota in *Cook* v. *Evans*, 45 S. D. 31, 38; 185 N. W. 262; and *Haaser* v. *Englebrecht*, 45 S. D. 143, 146; 186 N. W. 572.

The Supreme Court of Washington in *Still* v. *Palouse Irrigation & Power Co.*, 64 Wash. 606, 612; 117 Pac. 466, gave a more limited construction to the Desert Land Act, holding that thereby Congress recognized and assented to the appropriation of water in contravention to the common-law right of the riparian owner only in respect of desert lands granted under the act. See, also, *Bernot* v. *Morrison*, 81 Wash. 538, 559–560; 143 Pac. 104.

In *San Joaquin & K. R. Canal Co.* v. *Worswick*, 187 Cal. 674, 690; 203 Pac. 999, the Supreme Court of California followed the Washington court in holding that the language of the Desert Land Act applied only to desert-land entries.

To accept the view of the Washington and California courts would, in large measure, be to subvert the policy which Congress had in mind—namely, to further the disposition and settlement of the public domain. It is safe to say that by far the greater part of the public lands in the desert-land states and territories susceptible of reclamation in 1877 was remote from the natural sources of water supply. But these lands were subject to entry, not only under the Desert Land Act, but under other acts as well. Congress must have known that innumerable instances would arise where lands thereafter patented under the Desert Land Act and other lands patented under the preëmption and homestead laws, would be in

162

the same locality and would require water from the same natural sources of supply. In that view, it is inconceivable that Congress intended to abrogate the common-law right of the riparian patentee for the benefit of the desert land owner and keep it alive against the homestead or preëmption claimant.

As the owner of the public domain, the government possessed the power to dispose of land and water thereon together, or to dispose of them separately. *Howell* v. *Johnson*, 89 Fed. 556, 558. The fair construction of the provision now under review is that Congress intended to establish the rule that for the future the land should be patented separately; and that all non-navigable waters thereon should be reserved for the use of the public under the laws of the states and territories named., The words that the water of all sources of water supply upon the public lands and not navigable "shall remain and be held free for the appropriation and use of the public" are not susceptible of any other construction. The only exception made is that in favor of *existing* rights; and the only rule spoken of is that of *appropriation*. It is hard to see how a more definite intention to sever the land and water could be evinced. The terms of the statute, thus construed, must be read into every patent thereafter issued, with the same force as though expressly incorporated therein, with the result that the grantee will take the legal title to the land conveyed, and such title, and only such title, to the flowing waters thereon as shall be fixed or acknowledged by the customs, laws, and judicial decisions of the state of their location. If it be conceded that in the absence of federal legislation the state would be powerless to affect the riparian rights of the United States or its grantees, still, the authority of Congress to vest such power in the state, and that it has done so by the legislation to which we have referred, cannot be doubted.

The proceedings in connection with the adoption of the Desert Land Act bear out this view. The bill which subsequently became the act was called up for consideration in the Senate on February 27, 1877. The report of the committee, among other things, said that the larger portions of the lands bordering on the streams had been appropriated; that the provisions of the bill would enable settlers by combined efforts to construct more extensive works and reclaim lands now worthless; that a system had already grown up in the states and territories included in the bill which recognized priority of appropriation as the rule governing the right to the use of water, limiting the amount to that actually used, and thus avoiding waste. Senator Sargent of California, who was in charge of the bill, in the course of the debate said that one great difficulty had been that " cattle-men go under a fictitious compliance with the terms of the pre-emption law and take their land along the margin of the streams, and then there is no possibility of getting water to the back country at all. I want to provide so that persons in the back country may go above such a person, for instance, on Humboldt River, and take the water out and conduct it on to the back lands." Cong. Record, vol. V, pt. 3, 44th Cong., 2d Sess., pp. 1965–1966. There is nothing in the language of the act, or in the circumstances leading up to or accompanying its adoption, that indicates an intention on the part of Congress to confine the appropriation of water in contravention of the common-law doctrine to desert-land entrymen.

*Second.* Nothing we have said is meant to suggest that the act, as we construe it, has the effect of curtailing the power of the states affected to legislate in respect of waters and water rights as they deem wise in the public interest. What we hold is that following the act of 1877, if not before, all non-navigable waters then a part of the public domain became *publici juris,* subject to the plenary

control of the designated states, including those since created out of the territories named, with the right in each to determine for itself to what extent the rule of appropriation or the common-law rule in respect of riparian rights should obtain. For since " Congress cannot enforce either rule upon any state," *Kansas* v. *Colorado,* 206 U. S. 46, 94, the full power of choice must remain with the state. The Desert Land Act does not bind or purport to bind the states to any policy. It simply recognizes and gives sanction, in so far as the United States and its future grantees are concerned, to the state and local doctrine of appropriation, and seeks to remove what otherwise might be an impediment to its full and successful operation. See *Wyoming* v. *Colorado,* 259 U. S. 419, 465.[2]

---

[2] In this connection it is not without significance that Congress, since the passage of the Desert Land Act, has repeatedly recognized the supremacy of state law in respect of the acquisition of water for the reclamation of public lands of the United States and lands of its Indian wards. Two examples may be cited:

The Reclamation Act of 1902, c. 1093, 32 Stat. 388, directed the Secretary of the Interior (§ 8) to proceed in conformity to the state laws in carrying out the provisions of the act, and provided that nothing in the act should be construed as affecting or intending to affect or in any way interfere with the laws of any state or territory " relating to the control, appropriation, use, or distribution of water used in irrigation."

. The Act of June 21, 1906, c. 3504, 34 Stat. 325, 375, made an appropriation for constructing irrigation systems to irrigate lands of the Uncompahgre, Uintah, and White River Utes in Utah, with the proviso that " such irrigation systems shall be constructed and completed and held and operated, and water therefor appropriated under the laws of the State of Utah," etc. This was amended by the Indian Appropriation Act of March 3, 1909, c. 263, 35 Stat. 781, 812, which again recognized the supremacy of the laws of Utah in respect of appropriation, and provided that the appropriation should " be used only in the event of failure to procure from the State of Utah or its officers an extension of time in which to make final proof for waters appropriated for the benefit of the Indians."

The public interest in such state control in the arid-land states is definite and substantial.   In *Clark* v. *Nash*, 198 U. S. 361, 370, this court accepted that view to the extent of holding that in the arid-land states the use of water for irrigation, although by a private individual, is a public use; and sustained as constitutional a state statute which, for purposes of irrigation, permitted an individual to condemn a right-of-way for enlarging a ditch across the land of another.   Mr. Justice Peckham, delivering the opinion of the court, said:

"The rights of a riparian owner in and to the use of the water flowing by his land are not the same in the arid and mountainous States of the West that they are in the States of the East.   These rights have been altered by many of the Western States, by their constitutions and laws, because of the totally different circumstances in which their inhabitants are placed, from those that exist in the States of the East, and such alterations have been made for the very purpose of thereby contributing to the growth and prosperity of those States arising from mining and the cultivation of an otherwise valueless soil, by means of irrigation.   This court must recognize the difference of climate and soil, which render necessary these different laws in the States so situated."

For the foregoing reasons, we affirm the decree of the court below, passing without consideration the second question discussed by that court and upon which its decision rested, as to which we express no opinion.

*Decree affirmed.*