**PAUG–VIK, INC., LTD., Appellant,**

v.

**WARDS COVE PACKING CO., INC., and State of Alaska, Appellee,**

**STATE of Alaska, Cross-Appellant,**

v.

**PAUG–VIK, INC., LTD., Cross–Appellee.**

**Nos. 5015, 5149.**

Supreme Court of Alaska.

Sept. 25, 1981.

David C. Crosby, Wickwire, Lewis, Goldmark & Schorr, Seattle, Wash., and Robert S. Spitzfaden, Smith & Gruening, Anchorage, for appellant/cross-appellee.

R. Eldridge Hicks, Ruskin, Barker & Hicks, Anchorage, for appellee Wards Cove Packing Co.

Thomas E. Meacham, Asst. Atty. Gen., Anchorage, and Avrum M. Gross, Atty. Gen., Juneau, for appellee/cross-appellant State of Alaska.

Before RABINOWITZ, C. J., CONNOR, BURKE, and MATTHEWS, JJ., and SCHULZ, Superior Court Judge.*

OPINION

MATTHEWS, Justice.

Paug-Vik, Inc., the native village corporation of the village of Naknek, has appealed

---

* Schulz, Superior Court Judge, sitting by assignment made pursuant to article IV, section 16 of the Constitution of Alaska.

the Superior Court's decision that Wards Cove Packing Company, Inc., is entitled to continued water appropriations from Seagull Lake,[1] pursuant to the Alaska Water Use Act, AS 46.15.010, *et seq.* For the reasons set forth below, we agree with the conclusion reached by the trial court and affirm its decision.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Pursuant to the Alaska Native Claims Settlement Act, 43 U.S.C. § 1607(a), [ANCSA] the native inhabitants of Naknek formed the village corporation of Paug-Vik. Under the terms of ANCSA, patents of land surrounding the village have been conveyed to the corporation. Part of Paug-Vik's "core township," as defined in 43 U.S.C. § 1610(a)(1)(A), includes lands surrounding and underlying a number of shallow, freshwater lakes. One of those lakes, Seagull Lake, is between 2.3 and 4.5 feet in depth and is located approximately one mile east of the village of Naknek. It is the focal point of this litigation.

Located approximately 3000 feet to the south of Seagull Lake is the cannery owned by appellee, Wards Cove Packing Co., Inc. The cannery draws 400,000 gallons of water per day from the lake, through a 10-inch pipeline constructed in 1930 by the Red Salmon Canning Company, one of Wards Cove's predecessors in interest. On August 1, 1936, and again on January 17, 1959, the predecessors recorded with the United States Commissioner, Kvichak District at Naknek, Alaska, a Notice of Appropriation of Water Rights, pursuant to 43 U.S.C. § 661.[2] Also in January of 1959, a predecessor filed an application with the Department of the Interior for rights of way for a reservoir, a pipeline, a pumping plant, and a transmission line needed in order to take the water. This was granted in May of 1963 and included a 50 foot wide strip around the lake. Wards Cove filed a Declaration of Appropriation with the Alaska Division of Lands, Department of Natural Resources, on August 24, 1967, declaring the appropriation of water for "cannery operation, domestic use and fire protection."[3] There have been no competing declarations seeking to use the waters of Seagull Lake.

---

1. There is some disagreement over the proper name for the lake. We have adopted the designation used by Judge Singleton in the court below.

2. 43 U.S.C. § 661 provides:

   Whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; and the right of way for the construction of ditches and canals for the purposes herein specified is acknowledged and confirmed; but whenever any person, in the construction of any ditch or canal, injures or damages the possession of any settler on the public domain, the party committing such injury or damage shall be liable to the party injured for such injury or damage.

   All patents granted, or preemption or homesteads allowed, shall be subject to any vested and accrued water rights, or rights to ditches and reservoirs used in connection with such water rights, as may have been acquired under or recognized by this section.

3. The Alaska Water Use Act provides in relevant part:

   Sec. 46.15.040. *Right to appropriate.*

   (b) A right to appropriate water shall be obtained by first making application to the commissioner for a permit to appropriate. The commissioner shall by regulation prescribe the form and contents of the application and the procedure for filing the application. If a permit is granted and the means of appropriation is constructed a certificate of appropriation may be obtained.

   Sec. 46.15.060. *Existing rights.* A water right acquired by law before July 1, 1966 under a lawful common law or customary appropriation or use, is a lawful appropriation under this chapter. The appropriation is subject to applicable provisions of this chapter and rules and regulations adopted under this chapter.

   The purpose of section .060 is "to confirm existing and vested rights" as of the effective date of the Act, July 1, 1966, and to provide "a procedure for putting them on record." Trelease, Alaska's Water Use Act, II Land & Water Law Review 1, 31 (1967).

On July 1, 1976, Paug-Vik protested to the Commissioner of Natural Resources that Wards Cove was not entitled to its requested appropriation. Paug-Vik asserted that prior to ANCSA's passage in 1971 Seagull Lake was used or occupied by the Natives of Naknek, thus conferring "aboriginal title" on them and rendering the lake unavailable for appropriation by non-natives. Their protest was denied and Wards Cove received a Certification of Appropriation of Water, on March 18, 1977. Paug-Vik appealed the Commissioner's deci-sion to the Superior Court, and Judge Singleton granted Paug-Vik's request for a trial de novo.[4]

At trial Paug-Vik attempted to prove, as it had before the Commissioner, that the Natives of Naknek had aboriginal title to Seagull Lake at all times prior to the passage of ANCSA.[5] Section 8 of the Organic Act of 1884, according to Paug-Vik, exempted aboriginal title lands from the application of the public land laws extended to Alaska by that act.[6] Among those land laws was 43 U.S.C. § 661, under which

---

4. AS 46.15.135 spells out the procedure to be followed by the commissioner in determining existing rights to water in Alaska. Subsections (c), (d) and (e) of the statute outline the hearing and appeal procedure followed by the parties.

5. Mr. Justice Douglas provided perhaps the best explanation of the concept of aboriginal title in his opinion in *Tee-Hit-Ton Indians v. United States*, 348 U.S. 272, 279, 75 S.Ct. 313, 317, 99 L.Ed. 314, 320 (1955);

   The nature of aboriginal Indian interest in land and the various rights as between the Indians and the United States dependent on such interest are far from novel as concerns our Indian inhabitants. It is well settled that in all the States of the Union the tribes who inhabited the lands of the States held claim to such lands after the coming of the white man, under what is sometimes termed original Indian title or permission from the whites to occupy. That description means mere possession not specifically recognized as ownership by Congress. After conquest they were permitted to occupy portions of territory over which they had previously exercised "sovereignty," as we use that term. This is not a property right but amounts to a right of occupancy which the sovereign grants and protects against intrusion by third parties but which right of occupancy may be terminated and such lands fully disposed of by the sovereign itself without any legally enforceable obligation to compensate the Indians.
   This position of the Indian has long been rationalized by the legal theory that discovery and conquest gave the conquerors sovereignty over and ownership of the lands thus obtained. 1 Wheaton's International Law, ch. V. The great case of *Johnson v. McIntosh* (US) 8 Wheat. 543, *5 L.Ed.* 681, denied the power of an Indian tribe to pass their right of occupancy to another. It confirmed the practice of two hundred years of American history "that discovery gave an exclusive right to extinguish the Indian title of occupancy, either by purchase or by conquest." P. 587.

6. The Act of May 17, 1884, ch. 53, § 8, 23 Stat. 24, 26 (Organic Act) provides:

   Sec. 8. That the said district of Alaska is hereby created a land district, and a United States land office for said district is hereby located at Sitka. The commissioner provided for by this act to reside at Sitka shall be ex officio register of said land office, and the clerk provided for by this act shall be ex officio receiver of public moneys and the marshal provided for by this act shall be ex officio *surveyor-general* of said district and the laws of the United States relating to mining claims, and the rights incident thereto, shall, from and after the passage of this act, be in full force and effect in said district, under the administration thereof herein provided for, subject to such regulations as may be made by the Secretary of the Interior, approved by the President: Provided, *That the Indians or other persons in said district shall not be disturbed in the possession of any lands actually in their use or occupancy or now claimed by them but the terms under which such persons may acquire title to such lands is reserved for future legislation by Congress:* And, provided further, That parties who have located mines or mineral privileges therein under the laws of the United States applicable to the public domain, or who have occupied and improved or exercised acts of ownership over such claims, shall not be disturbed therein, but shall be allowed to perfect their title to such claims by payment as aforesaid: And provided also, That the land not exceeding six hundred and forty acres at any station now occupied as missionary stations among the Indian tribes in said section, with the improvements thereon erected by or for such societies, shall be continued in the occupancy of the several religious societies to which said missionary stations respectively belong until action by Congress. But nothing contained in this act shall be construed to put in force in said district the general land laws of the United States. [Emphasis added].

Wards Cove claims to have acquired its water rights through its appropriation accomplished in 1930. Paug-Vik's position throughout these proceedings has been that Wards Cove could not have acquired any valid rights to the water of Seagull Lake because, as aboriginal title land, the lake was exempt from the operation of § 661.

As a consequence, Paug-Vik's argument continues, Wards Cove has never possessed "valid existing rights" to the water, within the meaning of § 1613(g) of ANCSA.[7] Paug-Vik should thus take fee title to the lake as part of the ANCSA allotment, free of Wards Cove's invalid right of appropriation.

The court below decided that it was unnecessary to reach the complex issues of whether aboriginal title ever existed in Alaska, what criteria must be met in order to acquire aboriginal title, whether the Natives of Naknek in fact met those criteria and whether any title they might have acquired was abandoned by entry into the cash economy. The trial court, in a thorough and well reasoned opinion, ruled *inter*

*alia* that, (1) the waters of Seagull Lake were available for appropriation by Wards Cove and its predecessors pursuant to 43 U.S.C. § 661[8] prior to ANCSA, notwithstanding claims of aboriginal title, (2) Wards Cove's appropriations were validated by § 1603(a) of ANCSA,[9] and (3) § 1603(c) of ANCSA extinguished any claims based on aboriginal title or use and occupancy in derogation of Wards Cove's right-of-way permit and water appropriation.[10]

## II.  43 U.S.C. § 1603(a)

Congress has settled the question of whether conveyances of aboriginal title land under the federal public land laws are valid notwithstanding the non-disturbance language which we have emphasized in setting out the Organic Act of 1884.[11] Congress has declared in § 1603(a) of ANCSA that such conveyances are effective. Transfers so accomplished are among the reasons for the settlement effected by the act.[12]

The question remains whether an appropriation of water under the authority of 43

---

**7.**  43 U.S.C. § 1613(g) provides in relevant part:

(g) All conveyances made pursuant to this chapter shall be subject to valid existing rights. Where, prior to patent of any land or minerals under this chapter, a lease, contract, permit, right-of-way, or easement (including a lease issued under section 6(g) of the Alaska Statehood Act) has been issued for the surface or minerals covered under such patent, the patent shall contain provisions making it subject to the lease, contract, permit, right-of-way, or easement, and the right of the lessee, contractee, permittee, or grantee to the complete enjoyment of all rights, privileges, and benefits thereby granted to him. Upon issuance of the patent, the patentee shall succeed and become entitled to any and all interests of the State or the United States as lessor, contractor, permitter, or grantor, in any such leases, contracts, permits, rights-of-way, or easements covering the estate patented.

**8.**  *See* note 2, *supra.*

**9.**  43 U.S.C. § 1603 provides:

(a) All prior conveyances of public land and water areas in Alaska, or any interest therein, pursuant to Federal law, and all tentative approvals pursuant to section 6(g) of the Alaska Statehood Act, shall be regarded

as an extinguishment of the aboriginal title thereto, if any.

(b) All aboriginal titles, if any, and claims of aboriginal title in Alaska based on use and occupancy, including submerged land underneath all water areas, both inland and offshore, and including any aboriginal hunting or fishing rights that may exist, are hereby extinguished.

(c) All claims against the United States, the State, and all other persons that are based on claims of aboriginal right, title, use, or occupancy of land or water areas in Alaska, or that are based on any statute or treaty of the United States relating to Native use and occupancy, or that are based on the laws of any other nation, including any such claims that are pending before any Federal or state court or the Indian Claims Commission, are hereby extinguished.

**10.**  *Id.*

**11.**  *See* note 6 *supra.*

**12.**  *See United States v. Atlantic Richfield*, 612 F.2d 1132, 1135 (9th Cir.1980): "The district court held that § 4(a) [43 U.S.C. § 1603(a)] was retroactive, and thus that the entries under federal authorizations ... were not trespasses.... We agree."

U.S.C. § 661 effected a conveyance "of public land and water areas ... or any interest therein, pursuant to federal law" as those terms are used in § 1603(a). The answer to this question depends on the nature of the right acquired by an appropriation of water under 43 U.S.C. § 661.[13]

"For many years prior to the passage of the Act of July 26, 1866, c. 262, § 9, 14 Stat. 251, 253 (30 U.S.C.A. § 51 and note 43 U.S.C.A. § 661, par. 1 and note) the right to the use of waters for mining and other beneficial purposes in California and the arid region generally was fixed and regulated by local rules and customs. The first appropriator of water for a beneficial use was uniformly recognized as having the better right to the extent of his actual use. * * * The rule generally recognized throughout the states and territories of the arid region was that the acquisition of water by prior appropriation for a beneficial use was entitled to protection * * *. The rule was evidenced not alone by legislation and judicial decision, but by local and customary law and usage as well. *Basey v. Gallagher*, 20 Wall. 670, 683–84, 87 U.S. 670, 683–84, 22 L.Ed. 452 (1874); *Atchison v. Peterson*, 20 Wall. 507, 512–13, 87 U.S. 507, 512–13, 22 L.Ed. 414 (1874).

This general policy was approved by the silent acquiescence of the federal government, until it received formal confirmation of Congress by the Act of 1866, supra. *Atchison v. Peterson*, supra. Section 9 of that act provides that:

'Whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; and the right of way for the construction of ditches and canals for the purposes herein specified is acknowledged and confirmed: * * *' * * * And in order to make it clear that the grantees of the United States would take their lands charged with the existing servitude, the Act of July 9, 1870, c. 235, § 17, 16 Stat. 217, 218 (30 U.S.C.A. § 52 and note, 43 U.S.C.A. § 661, par. 2 and note) amending the Act of 1866 provided that:

'* * * All patents granted or preemption or homesteads allowed, shall be subject to any vested and accrued water rights, or rights to ditches and reservoirs used in connection with such water rights as may have been acquired under or recognized by the ninth section of the act of which this act is amendatory.'

The effect of these acts is not limited to rights acquired before 1866. They reach into the future as well, and approve and confirm the policy of appropriation for a beneficial use, as recognized by local rules and customs, and the legislation and judicial decisions of the arid-land states, as the test and measure of private rights in and to the nonnavigable waters on the public domain."

*Hunter v. United States*, 388 F.2d 148, 151–52 (9th Cir.1967), *quoting California-Oregon Power Co. v. Beaver Portland Cement Co.*, 295 U.S. 142, 154–55, 55 S.Ct. 725, 727–28, 79 L.Ed. 1356 (1935).

The rights passed by § 661 are dependent on local law in effect at the time of the appropriation. The status of water law in the Territory of Alaska has been reviewed and summarized in Trelease, *Alaska's New Water Use Act*, 2 Land and Water Law Review 1, 6–10 (1967). Briefly, territorial law was in accord with "the universal law of the Pacific Coast states and territories," *Miocene Ditch Co. v. Jacobson*, 2 Alaska 567, 574, 146 F. 680 (1905), under which the first appropriator of water on public land acquired the right to the water to the extent of his actual use. *Id.; see also Eglar v. Baker*, 4 Alaska 142 (1910). The appropriator's water rights were vested at the time of the act of appropriation. There was no legal requirement to post or record notices

---

**13.** The text of § 661 is set forth *supra* note 2.

of appropriation. *VanDyke v. Midnight Sun Mining & Ditch Co.*, 177 F. 85 (9th Cir.1910); *Kernan v. Andrus*, 6 Alaska 54 (Alaska 1918). Further,

> [t]o constitute a valid appropriation of water three elements must always exist: first, an intent to apply it to some beneficial use, existing at the time or contemplated in the future; second, a diversion from the natural channel by means of a ditch, canal, or other structure; and, third, an application of it, within a reasonable time, to some useful industry.

*Hoogandorn v. Nelson Gulch Mining Co.*, 4 Alaska 216, 220 (1910) *quoting Nevada Ditch Co. v. Bennett*, 30 Or. 59, 45 P. 472 (1896).

 The water right acquired by appropriation under § 661 is an interest in real property. *Adamson v. Black Rock Power & Irrigation Co.*, 12 F.2d 437 (9th Cir.1926). When it is acquired, it becomes private property. *Thayer v. California Development Co.*, 128 P. 21 (Cal.1912). In *Broder v. Natoma Water & Mining Co.*, 101 U.S. 274, 275, 25 L.Ed. 790, 791 (1870) the United States Supreme Court referred to § 661 as "an unequivocal grant." In *Bear Lake & River Waterworks & Irrigation Co. v. Garland*, 164 U.S. 1, 16–22, 17 S.Ct. 7, 11–13, 41 L.Ed. 327, 334, 335 (1896), the court spoke of § 661 as a grant of "*title* to the right-of-way or the use of the water" once the works for the appropriation are completed. [Emphasis added] In *Hunter v. United States*, 388 F.2d at 153, the Ninth Circuit Court of Appeals stated that a water appropriation under § 661 was "the equivalent of a grant of the use of the waters from the federal government . . ." and held that the grant was good even against the federal government.[14]

In view of the foregoing, we have no difficulty in concluding that water rights acquired by appropriation under § 661 are conveyances of an interest in public land and water areas pursuant to federal law within the meaning of § 1603(a).[15] They therefore must be regarded as extinguishing aboriginal title to the same interest.

This interpretation is consistent with the general purpose of Congress in enacting § 1603, which is that the extinguishment provisions of that section should be construed broadly to eliminate every claim resting on the assertion of aboriginal title. The Conference Committee Report concerning ANCSA stated:

> It is the clear and direct intent of the conference committee to extinguish *all* aboriginal claims and *all* aboriginal land titles, if any, of the native people of Alaska and the language of settlement is to be broadly construed to eliminate such claims and titles as any basis for any form of direct or indirect challenge to land in Alaska.

H.R.Conf.Rep.No. 92–746, 92d Cong., 1st Sess. 40, *reprinted in* [1971] U.S. Code Cong. & News 2192, 2253. [Emphasis in original]. *See also United States v. Atlantic Richfield Co.*, 612 F.2d 1132, 1139 (9th Cir. 1980).

In view of our conclusion that § 1603(a) governs this case it is unnecessary to address any of the alternative grounds on which the lower court based its decision.

The judgment is AFFIRMED.

COMPTON, J., not participating.

---

14. Similarly, in 1 Weil, Water Rights in Western States § 97 at 113 (3d ed.1911) it is stated that: "The Act of 1866, for diversions of waters on public land, declares a grant from the United States to the appropriator equal in force with, and equivalent to, a patent to riparian land."

15. Paug-Vik also points to 43 U.S.C. § 1613(g), *see* note 7 *supra*, arguing that although it "is not itself a validating provision," its list of documented conveyances that must be set forth in ANCSA patents, serves as "a useful guide to the scope of § 1603(a)." Because water appropriations are not listed, Paug-Vik argues that they are not "valid existing rights." We do not believe that Congress meant that the only rights that would be recognized are those in which a document has been issued by the government. An equally plausible construction of this section is that the second sentence simply refers to a sub-group of the valid existing rights referred to in the first sentence.