Argued and submitted May 13, 1998, affirmed May 19, respondent's petition for reconsideration filed June 2 and appellant's response filed June 9 allowed by opinion October 13, 1999

See 163 Or App 357 (1999)

# KINROSS COPPER CORPORATION,
## *Appellant,*

*v.*

# STATE OF OREGON,
## *Respondent.*

## (960906900; CA A98316)

981 P2d 833

514

Phillip D. Chadsey argued the cause and filed the briefs for appellant.

John T. Bagg, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Laura A. Schroeder, Schroeder Law Offices, and James L. Huffman, Member, Montana State Bar, filed the brief *amicus curiae* for Northwest Mining Association.

Susan L. Smith filed the brief *amicus curiae* for North Santiam Watershed Council.

Before Landau, Presiding Judge, Deits, Chief Judge, and Wollheim, Judge.

LANDAU, P. J.

## LANDAU, P. J.

In this inverse condemnation case, plaintiff Kinross Copper Corporation seeks compensation for the value of its unpatented mining claims, which it contends has been reduced to zero as a result of the state's denial of a permit to discharge wastewater that would result from plaintiff's proposed mining operations. Plaintiff alleged a right to compensation under the takings clauses of both the federal and state constitutions. The trial court entered summary judgment in favor of the state on both claims. We affirm.

■　　The parties stipulated to the relevant facts. In 1975, Amoco Minerals Company (Amoco) staked unpatented mining claims in the Cedar Creek Valley of the North Santiam River Subbasin in the Willamette National Forest. An "unpatented" mining claim refers to a possessory interest in minerals only, with the federal government retaining ownership of the land on which minerals may be located. *See generally* 4 *American Law of Mining* § 110.02(1)(b) (2d ed 1998). Individuals who hold such claims have the exclusive right to possession and enjoyment over them, "so long as they comply with the laws of the United States, and with State, territorial, and local regulations not in conflict with the laws of the United States governing their possessory title * * *." 30 USC § 26 (1994). To acquire an unpatented mining claim, it is necessary to discover a valuable mineral deposit. 30 USC § 22 (1994). To hold the claim, it is necessary to establish that the mineral deposit can be extracted, removed, and marketed at a profit. *See generally Chrisman v. Miller*, 197 US 313, 322-23, 25 S Ct 468, 49 L Ed 770 (1905). In 1976, Amoco discovered a body of copper ore on its claims.

In 1977, the Oregon Environmental Quality Commission (EQC) promulgated OAR 340-41-470(1), commonly known as the "Three Basin Rule." That administrative rule prohibits "any new or increased waste discharges" to the Clackamas, McKenzie, or North Santiam River Subbasins.

In 1989, Amoco leased the unpatented mining claims to plaintiff. Two years later, plaintiff developed a plan of operations for a copper ore mining project. The plan required plaintiff to discharge groundwater pumped from the

mine, along with other wastewater, into the North Santiam River Subbasin. The plan included obtaining applicable permits, including a National Pollutant Discharge Elimination System (NPDES) permit under the applicable state and federal clean water laws.

In 1992, plaintiff submitted to the Oregon Department of Environmental Quality (DEQ) an application for an NPDES permit. DEQ conducted various tests and concluded that, under the terms of plaintiff's proposed plan of operations, the discharge would not cause applicable water quality standards to be violated. DEQ also concluded that alternatives to discharging wastewater from the proposed mining operation were not viable and that, without an NPDES permit, plaintiff would not be able to develop and operate its proposed copper mine. In 1995, however, DEQ denied plaintiff's application for an NPDES permit on the ground that the Three Basin Rule prohibits *any* new waste discharges into the North Santiam River Subbasin. Plaintiff requested a contested case hearing before the EQC on the denial of the permit application. In 1996, EQC issued a final order denying plaintiff's application.

Plaintiff then initiated this action for damages. Plaintiff alleged claims for relief under the takings clauses of both the state and federal constitutions. Plaintiff moved for summary judgment on its federal takings claim on the ground that the denial of its NPDES permit rendered its unpatented mining claims entirely valueless and thus constituted a *per se* taking. The state moved for summary judgment on both claims on the ground that the denial of the NPDES took no property right of plaintiff's. According to the state, because unpatented mining claims are held subject to state regulation, plaintiff never had the right to develop its claim in violation of state law.

The trial court denied plaintiff's motion, granted the state's motion, and entered judgment for the state on both claims. In a letter opinion, the trial court explained that, because holding an unpatented mining claim requires proof that the claim continues to be marketable, and, because state regulations render plaintiff's claims unmarketable, plaintiff's mining claims were "extinguished," leaving plaintiff

with no property right that could be taken. The extinguishment of the claim did not amount to a taking, the court held, because unpatented mining claims constitute a unique form of property right that—by definition—is subject to state and federal regulatory authority and is more appropriately regarded as analogous to a contract right that is subject to a condition subsequent. The trial court cited as authority for its conclusion a law review article, Michael Graf, *Application of Takings Law to the Regulation of Unpatented Mining Claims*, 24 Ecology L Q 57 (1997).

On appeal, plaintiff assigns error to both summary judgment rulings. It contends that the trial court erred in adopting the reasoning of the cited law review article because it is contrary to nearly a century of takings case law. *Amicus* Northwest Mining Association expands on that contention, arguing that unpatented mining claims have long been recognized as property subject to the protections of the federal and state constitutions.

The state concedes that the trial court's rationale is at odds with "traditional takings analysis." It nevertheless contends that the trial court correctly concluded that plaintiff lost no property right because, among other things, plaintiff never had the right to discharge wastewater into a state waterway. *Amicus* North Santiam Watershed Council (Council) expands on that alternative argument and asserts that holders of unpatented mining claims do not have a property right to discharge wastes into state rivers.

Plaintiff responds that the argument is not "preserved" and, in any event, is incorrect. According to plaintiff, it does indeed have a right to discharge water from its mining operation, first, because the federal Mining Act of 1866 recognized a miner's rights through custom and other laws to use water on federal lands and, second, because state law provides that industrial water users have the right to use up to 5,000 gallons of groundwater per day without a permit.

In reviewing the trial court's rulings, we determine whether there is a genuine issue of material fact and whether the prevailing party is entitled to judgment as a matter of law. ORCP 47 C. In this case, the facts are undisputed; the sole question before us is whether the trial court correctly

concluded that the state was entitled to judgment as a matter of law, that is, that plaintiff suffered no taking of property under the state or federal constitutions.

Article I, section 18, of the Oregon Constitution, provides that "[p]rivate property shall not be taken for public use, * * * without just compensation[.]" The Fifth Amendment to the United States Constitution likewise prohibits the taking of private property for public use without just compensation. US Const, Amend V.

Identifying the extent to which governmental action short of outright physical acquisition of private property may constitute a taking of property under the state or federal constitutions has proved to be extraordinarily vexing for the courts. Various—sometimes even conflicting—tests have been invoked in countless cases over the last 75 years since Justice Holmes first penned the familiar, albeit cryptic, *dictum* that "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Penna. Coal Co. v. Mahon*, 260 US 393, 415, 43 S Ct 158, 67 L Ed 322 (1922).

■ But through the years and the cases, a few principles safely may be asserted as having been settled. Two such principles pertain to this case. The first is that, regardless of the difficulty of describing the exact point at which governmental action is transformed from constitutional regulation to unconstitutional taking, under both state and federal constitutions, government action that deprives property of *all* value without compensation is an unconstitutional taking. The precise formulation varies from case-to-case, but the gist is the same. Thus, under the Oregon Constitution, an action for inverse condemnation may be maintained to recover damages against a governmental agency that has taken action that has the effect of depriving the owner of "all economically viable use" of its property. *Boise Cascade Corp. v. Board of Forestry (S42159)*, 325 Or 185, 197-98, 935 P2d 411 (1997). Similarly, under the federal constitution, an action for inverse condemnation may be maintained for damages against a government agency that has taken action that has deprived the owner of "all economically beneficial use" of the

property. *Lucas v. South Carolina Coastal Council*, 505 US 1003, 112 S Ct 2886, 120 L Ed 2d 798 (1992).

■    The second settled principle of takings law is that, even if government action might otherwise constitute a taking of property, it will not if it is shown that what the government prohibits does not amount to a private property right in the first place. Said another way, an owner cannot maintain an action for loss of a property right that it did not ever have. Thus, for example, the Oregon Supreme Court held that owners of "dry sand" areas of the Oregon coast cannot be heard to complain of the loss of the right to exclude the public from those areas, because it is a "right" that they never possessed. *Stevens v. City of Cannon Beach*, 317 Or 131, 136-43, 854 P2d 449 (1993), *cert den* 510 US 1207 (1994); *see also Northwest Natural Gas Co. v. City of Portland*, 300 Or 291, 312, 711 P2d 119 (1985) (public utility could not maintain takings claim for costs of relocating utility facilities to make room for light-rail construction because utilities never possessed a property right to locate their facilities at any particular place). Similarly, the United States Supreme Court explained that even regulation that deprives land of all economically beneficial use will not give rise to takings liability "if the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with." *Lucas*, 505 US at 1027.

In this case, plaintiff contends that the denial of its application for an NPDES permit as a precondition to conducting a copper mining operation constitutes a taking of property under both state and federal constitutions. It is stipulated that the effect of the denial deprives plaintiff's unpatented mining claims of all of their economic value. The only question before us is whether, as the United States Supreme Court phrased it in *Lucas*, "the proscribed use interests were not part of [plaintiff's] title to begin with." 505 US at 1027.

It bears emphasis that the focus of the inquiry is the extent to which the "proscribed use" is part of plaintiff's title. That is to say, the determinative inquiry is whether *what the government has prohibited* is itself a property right. The matter bears emphasis because it is not the principal focus of plaintiff's briefing and argument. Plaintiff argues that it has

suffered an uncompensated taking, because it has been deprived of the right to mine copper as otherwise permitted by its unpatented mining claim. But the decision of the EQC did not prohibit plaintiff from mining. It prohibited plaintiff from discharging wastewater into the North Santiam River Subbasin. In consequence, to maintain its takings claim against the state, plaintiff must show that the denial of its NPDES permit application deprived it of a property right; that is to say, plaintiff must show that it had a right to discharge its wastewater into a river of the state. If plaintiff did not have the right to discharge wastewater into the river basin, it cannot complain that it has suffered an uncompensated taking.

■     Plaintiff initially contends that it should not have to address that question, because it was not the focus of the trial court's decision and was not argued by the state below. As the state correctly asserts, however, a trial court may be "right for the wrong reason," that is, we may affirm on grounds different from those on which the trial court based its decision, so long as there is evidence in the record to support those alternate grounds. *State v. Nielsen*, 316 Or 611, 628-32, 853 P2d 256 (1993); *State v. Lawson*, 127 Or App 392, 395, 872 P2d 986, *rev den* 320 Or 110 (1994).

In any event, the argument that the state and the Council raise in support of the trial court's decision varies only slightly from what the state asserted below. Before the trial court, the state asserted that plaintiff suffered no taking, because no property right had been taken, and it asserts the same theory on appeal. *See State v. Hitz*, 307 Or 183, 188, 766 P2d 373 (1988) (drawing distinction between raising an issue at trial, identifying a source for a claimed position, and making a particular argument). We turn, then, to the merits of the parties' arguments about whether the denial of an application for an NPDES permit to discharge mining wastewater constitutes a deprivation of a private property right.

■     At common law, an owner of land possessed a right to the natural flow of water running through the owner's land. The right was an incident of ownership of the land and did not depend on the owner's actual appropriation of the water for beneficial use. *See generally* Joseph W. Dellapenna, *The*

*Right to Consume Water Under "Pure" Riparian Rights*, 1 Waters and Water Rights 205, 219 (Robert E. Beck ed 1991).

During the nineteenth century, the federal government began to permit the mining of public lands in the West. Because the government retained title to the land itself, the traditional rules of riparian rights did not readily apply to the use of waters running through the mining claims. Mining customs developed over time, however, to fill the need of the times. One such custom was that rights to use water in mining operations could be obtained as an incident of the mining activity and that competing claims to the use of the water would be determined by the time of actual appropriation of the water for that use. *See generally* John N. Pomeroy, *A Treatise on the Law of Water Rights* § 14 (1893) ("Water was an indispensable requisite for carrying on mining operations; a permanent right to use certain amounts of water was as essential as the permanent right to occupy a certain parcel of mineral land."). That right included the right to discharge into a stream, although the right of discharge did not include mining debris that could wash on to the land of another. *See, e.g., Carson v. Hayes*, 39 Or 97, 105-06, 65 P 814 (1901) ("The doctrine of the authorities is that each mine owner or proprietor must take care of his own mining debris, and he can acquire no right, by custom or otherwise, to use the land of his neighbor as a dumping ground, without his consent, either by carrying and depositing the debris thereon, or by casting it into the stream, and allowing it to be washed down by the force of the current[.]").

In time, western states began to adopt the doctrine of "prior appropriation" as a general rule of water rights. Under the rule of prior appropriation, water rights are determined not as an incident of land ownership, but as a function of actual diversion of water to a recognized beneficial use. *See generally* Wells A. Hutchins, US Dep't of Agriculture, 1 *Water Rights Laws in the Nineteen Western States*, 440-42 (1971). Oregon law during the years following statehood began with adherence to the common law of riparian rights, but, by the turn of the century, the courts moved toward the rule of prior appropriation. *See generally* Janet C. Neuman, *Oregon*, 6 Waters and Water Rights 699 (Robert E. Beck ed 1991); Wells A. Hutchins, *The Common-Law Riparian Doctrine in*

*Oregon: Legislative and Judicial Modification*, 36 Or L Rev 193, 196-97 (1957).

Congress recognized the rule of prior appropriation in the Mining Act of 1866, 30 USC § 51 (1994), which provides:

> "Whenever, by priority of possession, rights to the use of water for mining * * * have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same * * *."

*See also Atchison v. Peterson*, 87 US (20 Wall) 507, 514-15, 22 L Ed 414 (1874). Congress reaffirmed that recognition in the Mining Act of 1870, 30 USC § 52.

The basic grant of unpatented mining claims originated in the Mining Law of 1872, 30 USC §§ 22-47 (1994). *See generally* 4 *American Law of Mining* § 110.02 (1998). The 1872 law effected no change to the preexisting recognition of the state water rights rules pertaining to mining claims. A later enactment did, however. The Desert Land Act of 1877 permits the entry and reclamation of "desert" land with a proviso that the right to the waters by a claimant depends on prior appropriation, subject to an additional proviso:

> "[A]ll surplus water over and above such actual appropriation and use, together with the water of all lakes, rivers, and other sources of water supply upon the public lands and not navigable, shall remain and be held free for the appropriation and use of the public for irrigation, mining and manufacturing purposes subject to existing rights."

43 USC § 321 (1994).

■ In *Hough v. Porter*, 51 Or 318, 95 P 732, 98 P 1083 (1909), the Oregon Supreme Court held that the second proviso had the effect of severing title to all public land in states covered by the 1877 Act, not merely "desert" land. The court reasoned that the first proviso was sufficient to protect those claiming rights to desert land, and that, by adding the second proviso, which reserved all water over and above such desert land appropriations, Congress apparently intended to protect the public's right to water on all public lands in all desert

states, including Oregon. *Id.* at 386-87. The Oregon court's construction of the Desert Land Act of 1877 ultimately was upheld in *Power Co. v. Cement Co.*, 295 US 142, 55 S Ct 725, 79 L Ed 1356 (1935), in which the United States Supreme Court held that, in enacting that second proviso, Congress effectively severed title to all public land—not merely "desert" land—from title to the nonnavigable waters on that land:

> "By its terms, not only all surplus water over and above such use as might be appropriated and used by the desert-land entrymen, but 'the waters of all lakes, rivers, and other sources of water supply upon the public lands and not navigable' were to remain 'free for the appropriation and use of the public for irrigation, mining and manufacturing purposes.' If this language is to be given its natural meaning, and we see no reason why it should not, it effected a severance of all waters upon the public domain, not theretofore appropriated, from the land itself. From that premise, *it follows that a patent issued thereafter for lands in a desert-land state or territory, under any of the land laws of the United States, carried with it, of its own force, no common-law right to the water flowing through or bordering upon the lands conveyed.*

> "* * * * *

> "As the owner of the public domain, the government possessed the power to dispose of land and water thereon together, or to dispose of them separately. The fair construction of the provision now under review is that *Congress intended to establish the rule that for the future the land should be patented separately; and that all nonnavigable waters thereon should be reserved for the use of the public under the laws of the states and territories named.*"

*Id.* at 158-62 (emphasis added; citations omitted). Thus, for claims granted after 1877, the property granted by the federal government under the Mining Act of 1872 consists of the unpatented mining claim itself. No water rights are granted as part of the claim. Water rights must be obtained as provided in the water rights laws of the state in which the site of the claim is located. *Id.*

As noted, nineteenth-century Oregon case law reflected a transition from the common law of riparian rights to the rule of prior appropriation. In 1909, however, the Oregon Legislature enacted a comprehensive statute that significantly altered the nature of water rights in this state. Or Laws 1909, chs 216 & 221. The legislature began by declaring—in a provision that survives to this day—that "[a]ll water within the state from all sources of water supply belongs to the public." ORS 537.110. The legislature then expressly recognized prior appropriation as the exclusive means of acquiring water rights in this state and established a comprehensive permit system for appropriating water. *See generally* Hutchins, 36 Or L Rev at 204-05. The details of the permitting process have been altered many times since then. *See generally* Gail L. Achterman and Peter D. Mostow, *Senate Bill 674: Increasing the Flow Rate of Oregon's Water Rights Permitting Process*, 32 Willamette L Rev 187 (1996). But the process continues to be the exclusive mechanism for permitting use of and establishing property rights in the waters within the state. *See generally* ORS ch 537.

■ Meanwhile, in 1972, Congress enacted the federal Clean Water Act, which, among other things, prohibits the discharges of pollutants—including any industrial wastes—into the waters of the United States without first obtaining an NPDES permit. 33 USC §§ 1311(a), 1342(a) (1994). States are permitted to administer the NPDES permit program, 33 USC § 1342(b) (1994), and Oregon has elected to do so. ORS 468B.050 expressly provides that, subject to enumerated exceptions, no person may discharge any waste into the waters of the state without obtaining a permit from DEQ. Nothing in either the federal or state laws, however, confers a property right to obtain a permit or conduct any activities for which a permit is required.

■ In light of the foregoing authorities, it becomes clear that plaintiff's contention that it has a right to discharge wastewater into the North Santiam River Subbasin is untenable. Plaintiff's unpatented mining claims came into existence in 1976, nearly 100 years after the enactment of the Desert Lands Act of 1877, which severed water rights from the grant of an unpatented mining claim. As a result, when the unpatented mining claims came into existence, no water

rights were conferred with them. If plaintiff has a private property right to discharge wastewater into the publicly owned waters of the state, the right must have come into existence separately after compliance with state law regarding the creation and recognition of state water rights. There is no evidence in the record—and plaintiff makes no contention that any such evidence exists—that plaintiff has obtained a water rights permit or certificate after complying with the requirements of the statutory permit process.

Plaintiff insists that the right to discharge into the North Santiam River Subbasin was created by common law and recognized by the Mining Act of 1866. Plaintiff, however, neglects to address the effect of the Desert Land Act of 1877, which—at least as to mining claims that were acquired after the enactment of that statute—severed water rights from the other rights conferred by the granting of the mining claims and required that water rights be obtained in accordance with applicable state water laws.

■       Plaintiff contends that, in any event, even under current state water law, it is entitled to use up to 5,000 gallons of ground water without a permit under ORS 537.545(1). That statute provides that, subject to exceptions not pertinent to this case:

> "[N]o registration, certificate of registration, application for a permit, permit, certificate of completion or ground water right certificate * * * is required for the use of ground water for:
>
> "* * * * *
>
> "(f)   Any single industrial or commercial purpose in an amount not exceeding 5,000 gallons a day[.]"

Plaintiff's contention is easily answered. By its terms, the statute permits the *consumption* of ground water. Even assuming that it applies to a mining operation, the statute does not permit the *discharge* of anything into a river of the state.

In short, plaintiff's takings claim is predicated on the loss of a right that it never possessed, namely, the "right" to discharge mining wastes into the waters of the state. It necessarily follows that, in denying plaintiff's application for a

permit to conduct that activity, the state has not effected a taking of private property within the meaning of either the state or federal constitutions. We therefore hold that, in concluding that the denial of plaintiff's application for an NPDES permit did not effect an uncompensated taking of property, the trial court was correct, albeit for a different reason from the one that the trial court adopted. In so holding, we express no opinion on the rationale that the trial court did adopt.

Affirmed.